PATRICK CHARLES McKENNA, APPELLANT, v.
THE STATE OF NEVADA, RESPONDENT.

No. 14564

August 27, 1985                                    705 P.2d 614

*Morgan Harris,* Public Defender, *Robert D. Larsen,* Deputy, *Margaret Lafko,* Deputy, and *Rick Ahlswede,* Deputy, Las Vegas; *Kenneth James McKenna,* Reno, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Robert Miller,* District Attorney, *James Tufteland,* Deputy, and *Chris Owens,* Deputy, Las Vegas, for Respondent.

# OPINION

*Per Curiam:*

On August 30, 1982, Patrick Charles McKenna was convicted of the first degree murder of a fellow inmate in the Clark County jail, for which he was sentenced to death.[1] Having reviewed the record on appeal, we conclude that appellant's assignments of error are without merit and we, therefore, affirm his conviction and sentence.

## FACTS

The body of 20 year old Jack Nobles, serving a sentence for burglary, was discovered in cell 4A2 of the Clark County jail at approximately 7:25 a.m. on January 6, 1979. A medical expert stated that asphyxia from ligature strangulation was the cause of death. He estimated that death occurred between the late evening hours of January 5, 1979 and the early morning hours of January 6, 1979.

January 5, 1979 was a Friday, and as was customary, inmates moved freely about the cell block until early the next morning, when they were confined to their cells. A majority of the witnesses testified that lockdown occurred at approximately 2:30 a.m. on January 6, 1979.

Substantial evidence established that after lockdown on January 6, 1979, Nobles was confined in cell 4A2 with McKenna, David Rossi and David Denson.

Denson testified that when he fell asleep after lockdown, between 2:30 and 3:00 a.m., Rossi was in bed, and McKenna and Nobles were playing chess. Denson stated that before leaving the cell for breakfast, and prior to discovering that Nobles had been murdered, McKenna asked him to pass a shank, or homemade knife, the handle of which was wrapped with fabric ligature, to inmate Seebon Harris.

Rossi testified that he witnessed McKenna murdering Nobles. He was awakened by Nobles climbing into the upper bunk of the bed, and a short time later, he noticed McKenna coming towards the bunk. Rossi heard McKenna and Nobles arguing in whispers, but could only make out the word "chess." Next, McKenna, using the toilet and the bottom of Rossi's bunk for footing, positioned himself over Nobles' bed. Rossi testified he then heard a wheezing sound. Several seconds later, he saw McKenna choking Nobles. Blood was running down McKenna's arm, and he did not turn Nobles loose until 3 to 5 minutes had elapsed. Then McKenna put Nobles back onto his (Nobles') bunk and covered him with a blanket.

---

[1]This was McKenna's second trial on this charge. The first conviction was reversed in McKenna v. State, 98 Nev. 38, 639 P.2d 557 (1982).

The testimony of Michael Dennis Jones was read into the record. Jones, who committed suicide prior to the trial, was in a nearby cell at the time of Nobles' death, and had testified for the state at McKenna's preliminary hearing. At about 1:30 a.m. on January 6, 1979, Jones observed McKenna and Nobles having an argument relative to a sexual act, during which McKenna shoved Nobles against a bunk bed and choked him. Nobles' knees buckled, and he dropped to the ground. Jones further testified that while this was taking place, Rossi was in his bed and Denson was asleep. According to Jones, after Nobles dropped to the ground, Rossi helped McKenna lift Nobles to his bunk.

Seebon Harris testified that on the morning of January 6, 1979, he received the shank that had been passed from McKenna to Denson. Upon learning that Nobles had been murdered, Harris gave it to a guard. Harris also related that McKenna was very upset on January 5, 1979,[2] and that just prior to dinner he struck another inmate without provocation. Harris also talked with Nobles shortly before dinner on January 5, 1979. Nobles, upset and crying, stated that McKenna was mad at him, and then said, "Why don't them damn guys just leave me alone."

Detective Burton Levos was the state's last witness. During an interview conducted January 8, 1979, he asked McKenna, "Are you involved in the case of the jail in reference to Nobles' murder?" When the question was completed, McKenna looked at him, nodded yes, and smiled.

The defense attempted to impeach most of the state's witnesses by showing that they received lenient treatment after giving information implicating McKenna.

The defense elicited testimony through inmates Ronnie Lee Jones and William Wirsen that Nobles was inclined to argue.[3] Jones testified that Rossi and Nobles were engaged in a dispute over a chess game the night before Nobles' body was discovered. Jones also said that during the argument he heard a noise like someone hitting the cell bars or the floor.

The defense stressed the inconsistency between Rossi's testimony that McKenna had choked Nobles with his arms and the medical expert's testimony that the cause of death was asphyxia due to ligature strangulation.

### QUALIFICATION OF JURORS IN A
### DEATH PENALTY CASE

During voir dire two prospective jurors, Jackson and Rosa,

---

[2]January 5, 1979 was the day McKenna was convicted of one count of robbery, two counts of second degree kidnapping with a weapon and three counts of sexual assault.

[3]Rossi, Denson and Harris testified that Nobles was not a belligerent person.

expressed reservations about the death penalty. The trial judge excluded both for cause. Appellant contends that exclusion of these potential jurors violated the standards established in Witherspoon v. Illinois, 391 U.S. 510 (1968), *reh'g denied,* 393 U.S. 898 (1968), and its progeny. We disagree.

Initially, we note that appellant did not object to the exclusion of Jackson, and his objection to the exclusion of Rosa was untimely. Appellant's omission and delay in objecting are significant under the new interpretation placed on *Witherspoon* by Adams v. Texas, 448 U.S. 38 (1980) and Wainwright v. Witt, ...... U.S. ......, 105 S.Ct. 844 (1985). The *Wainwright* court stated that appellant's failure to object was an indication of his contemporaneous impression that the juror was biased and properly excluded.

In *Wainwright, id.* at 852, the Supreme Court elucidated further on the *Witherspoon* standard by stating:

> That standard is whether the juror's views would ''prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'' We note that, in addition to dispensing with *Witherspoon's* reference to ''automatic'' decisionmaking, this standard likewise does not require that a juror's bias be proved with ''unmistakable clarity.'' [Footnote omitted.]

The Supreme Court also emphasized the discretionary role of the trial judge when it stated:

> Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra,* this is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 852-853.

Accordingly, we conclude that the trial judge did not err in excluding prospective jurors Rosa and Jackson.

McKenna also contends that the jury was devoid of persons unalterably opposed to the death penalty and was therefore biased in favor of the prosecution during the guilt phase of the trial. Additionally, appellant contends such a jury violated his right to a fair trial because the jury was an unrepresentative cross-section of the community.

We note initially that this issue was not raised in the trial court by either a timely objection or a request for an evidentiary

hearing. Furthermore, under *Witherspoon,* we are not required to presume that a death-qualified jury is biased in favor of the prosecution. Rather, the accused has the burden of establishing the non-neutrality of the jury. *Witherspoon,* 391 U.S. at 520, n. 18. *See also* Hovey v. Superior Court of Alameda Cty., 616 P.2d 1301 (Cal. 1980) (rejecting appellants' non-neutrality studies because of their failure to take into account that California excludes persons who would automatically vote for the death penalty, as well as those who would automatically vote against it); Rowan v. Owens, 752 F.2d 1186, 1190 (7th Cir. 1984) (noting that the crucial question is whether a death-qualified jury is likely to convict innocent people); Mattheson v. King, 751 F.2d 1432, 1442 (5th Cir. 1985) (holding a death-qualified jury does not deprive a defendant of a fair and impartial jury even if, on the average, it would favor the prosecution). Because McKenna failed to prove the non-neutrality of the jury which convicted and sentenced him, we reject this assignment of error.

### RULINGS ON EVIDENCE AND TESTIMONY

Detective Burton Levos testified concerning appellant's non-verbal response to Levos' question: "Are you involved in the case of the jail in reference to Nobles' murder?" McKenna's response, a look, a nod yes, and a smile, was made at an interview conducted on January 8, 1979.[4]

McKenna first contends that his nonverbal response was privileged as a plea negotiation under NRS 48.125.[5] "In determining whether a discussion can be properly characterized as a plea negotiation, we must consider the accused's subjective expectation of negotiating a plea at the time of discussion, and the reasonableness of that expectation." *See* U.S. v. O'Brien, 618 F.2d 1234, 1240-1241 (7th Cir. 1980), *cert. denied,* 449 U.S. 858 (1980), citing U.S. v. Robertson, 582 F.2d 1356, 1366 (5th Cir. 1978).

McKenna was informed by Levos that he and Detective Samolovitch lacked authority to make deals, but that he would relay any information to the District Attorney's office. He also testified that he asked McKenna to read the "Miranda Person Arrested

---

[4]Appellant, when first interviewed on January 6, 1979, refused to say anything. The January 8, 1979 interview was prompted by a letter McKenna wrote to Detective Samolovitch, stating his desire to "make a deal" by giving them information about unsolved crimes.

[5]NRS 48.125(1) reads:

    1. Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or any other crime is not admissible in a criminal proceeding involving the person who made the plea or offer.

Rights Card'' out loud at the beginning of the interview and McKenna indicated that he understood its contents.

The facts clearly show that McKenna could not have entertained a reasonable expectation that Levos and Samolovitch were authorized to negotiate a plea. Blackwell v. State, 663 P.2d 12, 15 (Okl.Crim.App. 1983). Therefore, we reject this assignment of error.

Next, appellant now contends that his response was ambiguous and therefore inadmissible under our holding in Harrison v. State, 96 Nev. 347, 608 P.2d 1107 (1980). No objection was made at trial to the admission of the nonverbal response on the ground it was ambiguous.

In *Harrison* we stated: "If an incriminating statement is heard and understood by an accused, and his response justifies an inference that he agreed or adopted the admission, then evidence of the statement is admissible at trial." *Id.* at 349. *See also* LeGrenade v. Gordon, 299 S.E.2d 809, 814 (N.C.App. 1983). McKenna responded to Levos' question whether he was involved in the Nobles murder by nodding yes and smiling. Appellant's nonverbal response was not ambiguous and was properly admitted into evidence.

The homemade knife, wrapped in fabric ligature, which McKenna sought to dispose of on the morning of January 6, 1979, was admitted into evidence. Appellant contends that it was error to permit introduction of the knife or a picture of it because it was prejudicial and irrelevant. We disagree.

Appellant has failed to show that the trial court erred in determining the knife's probative value outweighed its prejudicial impact. Lucas v. State, 96 Nev. 428, 431-432, 610 P.2d 727, 730 (1980). The knife, partially wrapped in fabric ligature, was relevant where the cause of Nobles' death was due to ligature strangulation.[6] The evidence also tended to prove appellant's knowledge that a crime had been committed.[7]

---

[6]NRS 48.015 reads:

As used in this chapter, "relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.

[7]NRS 48.045(2) reads:

2. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

On redirect examination, respondent asked Rossi questions about Nobles' character which exceeded the scope of the cross-examination. Appellant argues that the trial court denied him a fair trial by refusing his counsel the right to recross-examine with regard thereto. We hold that the trial court did not abuse its discretion in refusing to permit recross-examination on Nobles' character which was a collateral[8] matter. *See* Farmer v. State, 507 P.2d 1303, 1307 (Okl.Crim.App. 1973). Absent a showing of prejudice, we reject appellant's contention that he was thereby denied a fair trial.

Six days before trial, appellant filed a motion seeking production of Frank DePalma and five other witnesses. McKenna's trial began on August 16, 1982, but witnesses did not present testimony until August 20, 1982. The trial judge denied McKenna's motion for the production of DePalma on August 24, 1982, citing noncompliance with NRS 174.087.[9] Appellant's offer of proof related that DePalma would testify that Nobles was belligerent and had broken his (DePalma's) jaw in a fight, and that on the night of the murder, McKenna was locked in a cell where a poker game was taking place, not cell 4A2 where Nobles' body was discovered.

McKenna argues that because DePalma's testimony was not alibi evidence, the judge erred in not allowing DePalma to testify.[10] If DePalma's testimony was not to establish an alibi, it was cumulative because both Ronnie Lee Jones and Wirsen had testi-

---

[8]Nobles' character would have been relevant with proof that another person may have committed the crime, People in Interest of R.L., 660 P.2d 26, 28 (Colo.App. 1983); Dorsey v. State, 96 Nev. 951, 954, 620 P.2d 1261, 1263 (1961), or if appellant contended he killed in self-defense.

[9]NRS 174.087, in pertinent part, reads:

1. A defendant in a criminal case who intends to offer evidence of an alibi in his defense shall, not less than 10 days before trial or at such other time as the court may direct, file and serve upon the district attorney a written notice of his intention to claim such alibi, which notice shall contain specific information as to the place at which the defendant claims to have been at the time of the alleged offense and, as particularly as are known to defendant or his attorney, the names and addresses of the witnesses by whom he proposes to establish such alibi.

. . .

4. If a defendant fails to file and serve a copy of such notice as herein required, the court may exclude evidence offered by such defendant for the purpose of proving an alibi, except the testimony of the defendant himself. If such notice is given by a defendant, the court may exclude the testimony of any witness offered by the defendant for the purpose of proving an alibi if the name and address of such witness, as particularly as is known to the defendant or his attorney, is not stated in such notice.

fied that Nobles was prone to become involved in fights. However, it appears from the record that the major thrust of the testimony was to place McKenna in another cell after lockdown, and therefore it was alibi evidence subject to NRS 174.087. In either event, we conclude the trial court did not abuse its discretion in refusing to permit DePalma to testify.

McKenna next contends that if DePalma was an alibi witness, the trial judge erred in not excusing appellant's noncompliance with NRS 174.087. If "good cause" is shown, a court may exercise its discretion to admit alibi testimony in spite of noncompliance with NRS 174.087. Founts v. State, 87 Nev. 165, 483 P.2d 654 (1971). The proffered testimony in this case appeared for the first time approximately three and one-half years after the murder and following the close of the prosecution's case. McKenna failed to demonstrate, either at trial or on appeal, that good cause existed for the belated production of DePalma. We conclude, therefore, that the exclusion of this testimony was not error. *See* Reese v. State, 95 Nev. 419, 596 P.2d 212 (1979); Founts v. State, *supra.*

### PENALTY PHASE

Appellant moved to reopen his case during the penalty phase, to introduce the first six chapters of his autobiography. He contended the autobiography was relevant in that it contained evidence of (1) his difficult childhood, (2) his negative experiences with juvenile corrections authorities, and (3) his ability to contribute to society as a writer. The trial judge refused to admit the autobiography into evidence. Although in a capital case the court should interpret mitigating evidence broadly,[11] we are not persuaded that the trial judge erred in excluding McKenna's autobiography.

---

[10]McKenna's argument is premised upon the fact that the medical expert placed the time of death between the late evening hours of January 5, 1979 and the early morning hours of January 6, 1979; that inmates freely moved about the cell-block before lockdown; and that even if a prisoner was locked in the wrong cell (DePalma believed appellant was locked in the cell where the poker game was being played) he could have moved afterwards; therefore, McKenna had an opportunity before and after lockdown to commit the offense.

[11]Generally, rules governing the admissibility of evidence at trial do not apply at a sentencing hearing. State v. Conn, 669 P.2d 581, 582-583 (Ariz. 1983). In Bishop v. State, 95 Nev. 511, 516, 597 P.2d 273, 276 (1979) this court noted: "[A] defendant must be given the opportunity to present evidence of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense before a death penalty can be imposed. . . ." NRS 175.552, in pertinent part, states that during a penalty hearing "evidence may be presented concerning aggravating and mitigating

The state conceded appellant's writing ability and several witnesses testified that McKenna wrote extensively. McKenna's childhood difficulties and his problems with juvenile authorities were also presented in detail. Thus, the substance of matters contained in the autobiography was brought to the attention of the jury. Accordingly, we conclude that appellant has not demonstrated that excluding his autobiography was prejudicial error, State v. Boyd, 319 S.E.2d 189, 198 (N.C. 1984), *cert. denied,* ...... U.S. ......, 105 S.Ct. 2052 (1985).

Furthermore, we find no abuse of discretion in the trial judge's refusal to allow appellant to reopen his case. Williams v. State, 91 Nev. 533, 535, 539 P.2d 461, 462-463 (1975); *Accord* State v. Boodry, 394 P.2d 196, 198-199 (Ariz. 1964), *cert. denied,* 379 U.S. 949 (1964).

McKenna next contends that the trial court erred in allowing testimony upon executive clemency and instructing the jury that a sentence of life imprisonment without the possibility of parole could be commuted to life imprisonment with the possibility of parole.

Detailed testimony on the process of executive clemency has never been favored by this court. *See* Summers v. State, 86 Nev. 210, 467 P.2d 98 (1970); Bean v. State, 81 Nev. 25, 398 P.2d 251 (1965), *cert. denied,* 384 U.S. 1012 (1966). We now specifically disapprove its use in any form.[12]

---

circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to the sentence, whether or not the evidence is ordinarily admissible." NRS 200.035 in relevant part states: "Murder of the first degree may be mitigated by any of the following circumstances, even though the mitigating circumstance is not sufficient to constitute a defense or reduce the degree of the crime:

7. Any other mitigating circumstance."

[12]Responding to a question about the frequency of commutations by the State Board of Pardons Commissioners, Mr. Jeffers, a Chief Deputy of the Clark County District Attorney's office, stated: "Based on my experience it happens more times than it doesn't." Appellant's objection on grounds of relevance was overruled. Appellant chose not to cross-examine on this point.

Our concern is that the witness's ambiguous statement could have been misperceived by the jury. It is unclear just what was meant by "based on my experience." His conclusion would have been misleading if intended to represent that the majority of petitions for commutation are granted. Appellant neglected to cross-examine the witness about his personal experiences, which perhaps would have supported his conclusion that "it happens more times than it doesn't."

In holding that appellant has failed to prove that the statement was sufficiently prejudicial to warrant reversal, we note with particularity that: (1) the testimony was ambiguous; (2) the only objection by appellant was on the ground of relevance; (3) the evidence of appellant's guilt was overwhelming; and (4) the jury found no factors mitigating against imposition of the death penalty.

This court's recent decision in Petrocelli v. State, 101 Nev. 46, 692 P.2d 503, 510 (1985), recites how district courts should instruct jurors on the issue of executive clemency, if a request for instruction on the question is tendered. However, *Petrocelli* was decided after the trial of the instant case, and we do not believe, in this case, that a different verdict would have been reached if the procedures set forth in *Petrocelli* had been followed in the instant case.

The jury was instructed that it could impose the death sentence only if aggravating circumstances outweighed mitigating circumstances; otherwise, the penalty imposed should be life imprisonment. Although appellant concedes that this instruction is consistent with NRS 200.030(4)(a), [13] he contends that the court was under a duty to further instruct the jurors that they had to determine beyond a reasonable doubt that death was the appropriate punishment. We disagree.

First, the instruction given in the case at bar was permissive[14] and not mandatory. It gave the jury the option of imposing the death penalty if they found that aggravating circumstances outweighed mitigating circumstances. Secondly, Nevada's death penalty procedure has been recently upheld by this court. In Ybarra v. State, 100 Nev. 167, 176, 679 P.2d 797, 803 (1984), *cert. denied,* ...... U.S. ......, 105 S.Ct. 1372 (1985) we stated: "Since our procedure for weighing aggravating and mitigating circumstances provides the sentencer with adequate information and guidance and the accused with sufficient guarantees that the penalty of death will not be imposed arbitrarily and capriciously, the challenged statute passes constitutional muster."

Lastly, as the Ninth Circuit Court stated in Harris v. Pulley, 692 F.2d 1189, 1195 (9th Cir. 1982), *rev'd* on other grounds, 465 U.S. 37 (1984): "The United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed."

---

[13]NRS 200.030(4)(a) provides:

> Every person convicted of murder of the first degree shall be punished:
> (a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.

[14]The instruction read:

> The jury may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found.

## REVIEW OF DEATH PENALTY

NRS 177.055(2)(d) requires that we review a death sentence to determine (1) whether evidence supports the finding of an aggravating circumstance or circumstances; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor; (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases in the state, considering both the crime and the defendant.[15]

The jury found two aggravating circumstances: (1) the murder was committed by a person who was previously convicted of another felony or felonies involving the use or threat of violence to the person of another, and (2) the murder involved depravity of mind. The jury further found there were no mitigating circumstances.

A review of the record indicates that the appellant is no stranger to the criminal justice system. From the age of 13 years he had significant involvement with juvenile authorities resulting in his detention in facilities in both Clark and Elko Counties. In 1964, when he was 17 years old, he was sentenced to the Nevada State Prison for a term of 5 to 15 years for crimes of violence. This pattern continued after incarceration. On October 14, 1966, he escaped from the state prison and was picked up shortly thereafter. On January 30, 1967, he was involved in another escape attempt in which two officers were taken hostage. On August 22, 1973, appellant jammed an eleven inch homemade knife into the stomach of a correctional officer, and with other inmates caused significant damage to the facility on that occasion.

He was paroled April 26, 1976, and a short time later picked up for parole violation, allegedly having committed crimes in Washoe County for which he apparently was never tried. On release from the state prison, March 19, 1978, his career of crime and violence continued unabated. A crime spree in July 1978 resulted in a conviction of one count of robbery, two counts of second degree kidnapping with a weapon and three counts of sexual assault. Between August 25 and August 27, 1979, he and other inmates took over the Las Vegas annex of the Clark County

---

[15]NRS 177.055(2)(d) was recently amended to abolish the proportionality review requirement. This amendment became effective June 6, 1985. 1985 Stats. ch. 527 § 1, at 1597-1598. The prohibition against ex post facto laws requires that we apply the law as it existed when the crime was committed. *See* Goldsworthy v. Hannifin, 86 Nev. 252, 468 P.2d 350 (1970). In *Goldsworthy* we held that an act amending parole eligibility could not be applied to the detriment of a defendant whose crime was committed before the amendment took effect. *Id.* at 256-57. Because Nobles was murdered well before June 6, 1985, we must conduct a proportionality review of appellant's sentence.

jail, for which he was convicted of attempted escape with the use of a weapon, possession of a firearm by an ex-felon, and two counts of robbery with a weapon. In sum the record indicates, starting in 1964, thirteen felonies accompanied by violence or threat of violence to ten persons, for which he pled guilty or was convicted.

The circumstances surrounding the murder by ligature strangulation support the jury's finding that the murder involved depravity of mind. It can be inferred that McKenna was harassing and brutalizing Nobles, resulting in the death of a 20 year old inmate for no apparent reason.

From our review of the record, we conclude: (1) that the evidence supports the jury's findings of aggravating circumstances; (2) that the sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor; (3) that the death sentence imposed in this case is not excessive or disproportionate to the penalty imposed in similar cases within the state, considering both the crime and the defendant. *See* Neuschafer v. State, 101 Nev. 331, 705 P.2d 609 (1985); Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985); Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979); Deutscher v. State, 95 Nev. 669, 601 P.2d 407 (1979).

Accordingly, we affirm McKenna's conviction and sentence.