An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

IN THE SUPREME COURT OF THE STATE OF NEVADA

DERRICK L. MCKNIGHT,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 56654

FILED

DEC 1 8 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## ORDER OF AFFIRMANCE

This is an appeal from a judgment of conviction, pursuant to a jury verdict, of burglary, conspiracy to commit robbery, robbery with the use of a deadly weapon, and first-degree murder with the use of a deadly weapon. Eighth Judicial District Court, Clark County; Kathy A. Hardcastle, Judge.

After watching and following Kenneth Hardwick at the Mandalay Bay Resort and Casino in Las Vegas for quite some time, appellant Derrick McKnight and Timothy Burnside followed Hardwick when he exited the parking structure of the property. Shortly thereafter, Hardwick pulled up to a Jack-in-the-Box drive-thru window. A video recording obtained from a surveillance camera showed a man point a gun and shoot into Hardwick's car several times. A Jack-in-the-Box employee saw one of the two men involved in the shooting retrieve a small silver case from Hardwick's car. Hardwick died as a result of his injuries.

A witness heard the gunshots as she was walking to her car in a nearby parking lot. She noticed a white car pull up next to her. The passenger exited the car, placed a gun in the car, and took off a black jacket and put it in the car. The driver got out of the car and also removed a black jacket and put it in the car. The two men ran in the direction of

15-38734

the Jack-in-the-Box. As the witness went to call 9-1-1, she observed the two men walking around the drive-thru at the Jack-in-the-Box. After placing the 9-1-1 call, she observed the two men running back to the white car. From video surveillance photographs, the witness identified McKnight and Burnside as the men she saw after the shooting based on their clothing. She identified McKnight as the driver of the white car.

Other evidence connected McKnight to Hardwick's murder. The clothing that McKnight and Burnside were wearing when they were recorded by the Mandalay Bay surveillance cameras matched the clothing worn by the men in the Jack-in-the-Box video surveillance. McKnight's mother owned a white Mazda, which she had loaned to McKnight. After the murder, McKnight approached a family friend, Albert Edmonds, and asked Edmonds to store a car in Edmonds' garage. Edmonds agreed. The following day, McKnight's mother retrieved the car from Edmonds' garage. During a search of Edmonds' home police found 9mm ammunition in a room in which McKnight had stayed in December 2006. Eight 9mm shell casings had been recovered from the Jack-in-the-Box drive-thru, all fired from a single firearm. McKnight's and Burnside's cell phone records showed that calls made from or received by their cell phones in the hours surrounding the murder were handled by cell phone towers near the Mandalay Bay.

A jury convicted McKnight of first-degree murder with the use of a deadly weapon, robbery with the use of a deadly weapon, conspiracy to commit robbery, and burglary. He was sentenced to 35 to 156 months in prison for robbery with the use of a deadly weapon, plus an equal and consecutive term for the deadly weapon enhancement; 13 to 60 months in prison for conspiracy to commit robbery; 22 to 96 months in prison for

burglary; and life in prison without the possibility of parole for murder plus an equal and consecutive term for the deadly weapon enhancement, to run consecutively to the other counts.[1] This appeal followed.

McKnight raises several claims of trial error, all of which we conclude lack merit for the reasons explained below.

*Motion to impanel separate jury or sever trial*

McKnight contends that the district court abused its discretion by denying his motion to empanel a separate jury or, alternatively, motion for severance. In particular, he argues that his Sixth and Fourteenth Amendment rights to a fair and impartial jury were violated because a death qualified jury determined his guilt. The United States Supreme Court has rejected the argument that a defendant tried with a codefendant who is facing the death penalty is deprived of his right to an impartial jury when tried by a death qualified jury, *see Buchanan v. Kentucky*, 483 U.S. 402, 419-20 (1987), and we have observed that under *Witherspoon v. Illinois*, 391 U.S. 510, 520 n.18 (1968), we are "not required to presume that a death-qualified jury is biased in favor of the prosecution," *McKenna v. State*, 101 Nev. 338, 344, 705 P.2d 614, 618 (1985). Rather, a defendant bears "the burden of establishing the non-neutrality of the jury." *Id.* McKnight makes no argument that any seated juror was biased against him. Nor does he substantiate his claim that he was deprived of his right to a jury that represents a fair cross-section of the community due to the exclusion of jurors who could not qualify for a capital trial. McKnight has not shown bias or non-neutrality by any juror,

---

[1]McKnight and Burnside were tried together. Burnside was sentenced to death for the murder.

 

and he was not entitled to a severance of the trial solely because the jury was death qualified. We further reject his contention that he was entitled to a separate jury because it is not authorized by Nevada law. *See Ewish v. State*, 110 Nev. 221, 232, 871 P.2d 306, 314 (1994). Therefore, the district court did not abuse its discretion by denying his motion. *See Chartier v. State*, 124 Nev. 760, 764, 191 P.3d 1182, 1185 (2008).

*Batson challenges*

McKnight contends that the district court abused its discretion by denying his challenge to the prosecution's peremptory strikes against three prospective jurors (nos. 124, 183, and 191) under *Batson v. Kentucky*, 476 U.S. 79 (1986); *see also Purkett v. Elem*, 514 U.S. 765, 767 (1995) (summarizing the three-step *Batson* analysis), because the prosecutor's reasons for striking the prospective jurors were a pretext for racial discrimination. The prosecution's strikes against these jurors were grounded in its assertions that each of the jurors provided inconsistent views regarding the death penalty in their questionnaires as compared to their answers during voir dire. We conclude that the record supports the district court's determination that the prosecution proffered race-neutral reasons for striking the three prospective jurors and that there was no evidence of discrimination. Accordingly, the district court did not abuse its discretion by denying McKnight's *Batson* challenges. *Thomas v. State*, 114 Nev. 1127, 1136-37, 967 P.2d 1111, 1117-18 (1998); *Washington v. State*, 112 Nev. 1067, 1071, 922 P.2d 547, 549 (1996).

*Sleeping juror*

McKnight argues that the district court abused its discretion by not conducting a hearing after being alerted that a juror was sleeping during trial. At the close of evidence and the settling of instructions,

Defense counsel advised the district court that juror 6 appeared to have been sleeping "numerous times" during trial. The trial judge responded that she had been keeping a close eye on the jurors to ensure that they were paying attention and did not see juror 6 sleeping. We conclude that McKnight has not shown that the district court abused its discretion by not further investigating his allegation or granting relief. *See United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir. 2004) (reviewing district court's decision in denying defendant's request to interview jury about allegation of sleeping juror for abuse of discretion). The trial "court's own contemporaneous observations of the juror may negate the need to investigate further by enabling the court to take judicial notice that the juror was not asleep or was only momentarily and harmlessly so." *Samad v. United States*, 812 A.2d 226, 230 (D.C. 2002) (internal quotation marks omitted); *see also United States v. Carter*, 433 F.2d 874, 876 (10th Cir. 1970). Because the trial judge in this case regularly observed the jurors and never saw juror 6 sleeping, there was no need to investigate further. In addition, McKnight did not bring the matter to the district court's attention when the juror was believed to be sleeping, but waited until sometime later, and even then he did not explain how long the juror had been sleeping, identify what portions of the trial or critical testimony the juror had missed, specify any resulting prejudice, or request a remedy of any kind. Considering the district court's contemporaneous observations and the totality of the surrounding circumstances, we conclude that the district court did not abuse its discretion.[2]

---

[2]This court recently rejected a similar argument by codefendant Burnside. *Burnside v. State*, 130 Nev., Adv. Op. 40, 352 P.3d 627, 638-39 (2015).

*Motion to suppress identification*

McKnight argues that the district court erred by denying his motion to suppress identification testimony from Syncerrity Ray. There are two aspects to his claim. First, he contends that the detective involved in a photographic lineup did not follow proper procedure. In this, he points to the detective's statement during the identification procedure that Ray "should not worry about being right or wrong" but should identify anyone in the photographs that she believed she saw on the night of the murder. McKnight also challenges the detective's suggestion that Ray could identify someone from the photographs despite her statements that "it was hard" and she "did not know." McKnight argues that the detective's statements contravened instructions given to Ray that she did not have to identify anyone in the photographs. Considering the comments in context, we conclude that they did not render the identification procedure suggestive, as the detective did not suggest to Ray that she had to identify anyone in the photographs.

Second, McKnight argues that suppression was required because an interview where Ray identified the two men involved in the shooting from photographs was not recorded. Specifically, he contends that the basis for the detective's decision not to record this particular interview—Ray's apprehension and fear—is not credible, as Ray had previously participated in recorded police interviews. However, McKnight provides no authority requiring the recording of Ray's interview. Nor does he explain how the lack of a recording rendered the identification procedure suggestive. Accordingly, we conclude that the district court did not abuse its discretion.

*Annotation and narration of surveillance videos*

McKnight argues that the district court abused its discretion by allowing annotations to be placed upon video surveillance images and by allowing police detectives to narrate the videos as they were played for the jury, describing what the videos showed. He contends that the annotation and narration invaded the province of the jury because the detectives had no prior familiarity with him or Burnside and were in no better position than the jurors to determine the identity of the men depicted in the videos and whether the men were stalking Hardwick.

The police detectives' testimony that McKnight and Burnside were the individuals in the surveillance videos and the alias annotations were based on other identification evidence that was admitted before the detectives testified, including descriptions of the clothes the men were wearing when the murder occurred and the testimony of Stewart Prestianni, who was familiar with Burnside and McKnight and their aliases. Because the detectives did not independently identify the men, they were not required to have some prior knowledge or familiarity with the men or be qualified experts in videotape identification. *Cf. Edwards v. State,* 583 So. 2d 740, 741 (Fla. Dist. Ct. App. 1991) (concluding that police officer's testimony that he recognized defendant in videotape of drug sale was inadmissible because there was no showing that officer had prior knowledge or familiarity with defendant or was qualified as expert in videotape identification). *See generally Rossana v. State,* 113 Nev. 375, 380, 934 P.2d 1045, 1048 (1997) (observing that lay witness's opinion testimony concerning identity of person in surveillance photograph is admissible under NRS 50.265 "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the

Supreme Court
OF
Nevada

(O) 1947A

7

photograph than is the jury" (internal quotation marks omitted)). As to McKnight's complaint that the detective was improperly allowed to opine that the men in the videotape were surveilling Hardwick, the district court admonished the jurors that the detective was expressing his opinion as to the content of the Mandalay Bay surveillance video and that they would have the opportunity to review the videos in the jury room and draw their own conclusions as to what the videos showed. We discern no error.[3]

McKnight also argues that the district court erred by refusing to give his proposed instruction advising jurors that their interpretation of the actions depicted in the videos is controlling, not the interpretation or opinions of the State's witnesses. Considering the admonishment noted above and other instructions on matters related to witness credibility and believability, witnesses with special knowledge, and drawing reasonable inferences from the evidence, McKnight has not shown that the district court abused its discretion by rejecting his requested instruction. *Jackson v. State*, 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001).

*Cell phone records*

McKnight argues that the district court abused its discretion by admitting the defendants' cell phone records, which showed the location of cell phone towers that handled their cell phone calls, and by allowing a cell phone company records custodian to testify about those records and signal transmissions and a detective to testify about a map he created to show the locations of the cell phone towers. In this, he contends that the evidence amounted to expert testimony and neither of the prosecution's

---

[3]This court rejected a similar argument by Burnside. *Burnside*, 352 P.3d at 639-40.

notices of expert witnesses identified the records custodian and the detective as experts.

We recently dealt with the scope of lay and expert witness testimony in this matter in *Burnside v. State*, 130 Nev., Adv. Op. 40, 352 P.3d 627, 635-37 (2015); *see* NRS 50.265 (lay witness testimony); NRS 50.275 (expert witness testimony). Determining whether the challenged evidence constitutes expert testimony "lies with a careful consideration of the substance of the testimony—does the testimony concern information within the common knowledge of or capable of perception by the average layperson or does it require some specialized knowledge or skill beyond the realm of everyday experience?" *Burnside*, 352 P.3d at 636.

As to the detective's testimony, he reviewed the cell phone records and cell site information and used that data to create a map of calls made with cell phones registered to McKnight and Burnside during the time period relevant to the murder. The map showed that several calls were made between Burnside's and McKnight's cell phones during the early morning hours of December 5, 2006, and the signals related to those calls were transmitted from cell sites near the Mandalay Bay. We conclude here, as we did in *Burnside*, that the detective's testimony did not fall within the scope of expert testimony and therefore the prosecution had no obligation to notice the detective as an expert witness. Therefore, the district court did not abuse its discretion in this regard.

As to the Sprint/Nextel record custodian, his testimony centered on explaining to the jury how cell phone signals are transmitted from cell sites. We concluded in *Burnside* that this testimony "is not the sort that falls within the common knowledge of a layperson but instead was based on the witness's specialized knowledge acquired through his

employment." *Id.* at 637. Nevertheless, reversal of the judgment of conviction is not warranted considering other evidence placed McKnight and Burnside at Mandalay Bay during the relevant time period. *See* NRS 178.598 (harmless error rule); *Valdez v. State,* 124 Nev. 1172, 1189, 196 P.3d 465, 476 (2008) (observing that nonconstitutional error requires reversal "only if the error substantially affects the jury's verdict").[4]

*Jury instructions*

McKnight argues that the district court abused its discretion by giving several jury instructions, including instructions on robbery, coconspirator statements, and "material elements" of the offenses, implied malice, premeditation and deliberation, and equal and exact justice. He also asserts that the district court erred by not giving his proposed instruction.

*Robbery*

McKnight argues that the district court erred by overruling his objection to the robbery and felony-murder instructions because robbery should be defined as a specific intent offense. He recognizes that this court determined in *Litteral v. State,* 97 Nev. 503, 508, 634 P.2d 1226, 1228-29 29 (1981), *disapproved on other grounds in Talancon v. State,* 102 Nev. 294, 721 P.2d 764 (1986), that robbery is a general intent crime but

---

[4]McKnight also challenges the admission of the cell phone tower records based on lack of notice. While the substance of his argument is not entirely clear, it appears that his complaint is linked to the prosecution's failure to notice the records custodian and detective as experts. To the extent that it is an independent claim, the prosecution's notice of lay witnesses identified the Sprint/Nextel record custodian and the detective, and he does not allege a discovery violation occurred with regard to records.

urges the court to overrule *Litteral* and return robbery to its common law classification as a specific intent offense given the ambiguity in NRS 200.380 as to the requisite intent, the common law history, and the rule of lenity. As we recently observed in *Burnside*, we are not persuaded to depart from *Litteral*. 352 P.3d at 644.

McKnight further argues robbery should be treated as a specific intent offense when it is used to support a felony-murder charge. However, the Legislature saw fit to view robbery as involving dangerous conduct that creates a foreseeable risk of death. It is that risk that makes robbery an appropriate felony to support a felony-murder charge.[5]

*Coconspirator statements*

McKnight contends that the district court's instruction regarding the jury's consideration of a coconspirator's statements in furtherance of a conspiracy confused and misled the jury to believe that he could be convicted under a conspiracy theory based on slight evidence rather than the constitutionally required beyond-a-reasonable-doubt standard. We disagree. The instruction solely addresses the jury's consideration of a coconspirator's statements in furtherance of a conspiracy as evidence against another member of the conspiracy, outlining the preconditions to the jury's consideration of the evidence, including slight evidence that a conspiracy existed. *See McDowell v. State,* 103 Nev. 527, 529, 746 P.2d 149, 150 (1987); *Peterson v. Sheriff, Clark Cnty,* 95 Nev. 522, 524, 598 P.2d 623, 624 (1979). The instruction does not

___

[5]To the extent McKnight contends that robbery should be treated as a specific intent offense to satisfy the constitutionally required narrowing function to impose a death sentence, his contention is irrelevant because he was not subject to the death penalty.

suggest that McKnight may be convicted of conspiracy or a conspiracy theory of liability based on slight evidence instead of the constitutionally required beyond-a-reasonable-doubt standard. Additionally, two other instructions advised the jury that the State had to prove McKnight's guilt beyond a reasonable doubt. Accordingly, the district court did not abuse its discretion by giving the instruction.[6] *See Crawford v. State,* 121 Nev. 744, 748, 121 P.3d 582, 585 (2005).

*"Material element"*

McKnight contends that the district court abused its discretion by giving instruction 38, which advised the jury in pertinent part: "The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense." He argues that because the instruction does not identify which elements are "material," the jury was left to speculate which elements were "material." In *Burnside,* we concluded that although the "material element" language is unnecessary given the prosecution's burden to prove all elements of an offense beyond a reasonable doubt, that language did not suggest to the jury that the prosecution "carried a lesser burden of proof on any element or charged offense." 352 P.3d at 638. Where, as here, the instructions as a whole make it clear that the prosecution must prove every element of the crime, the reference to "material element" in the instruction is not so misleading or confusing as to warrant reversal.

---

[6]This court rejected a similar argument by Burnside. *Burnside v. State,* 352 P.3d at 644.

*McKnight's proposed instruction*

McKnight asserts that the district court abused its discretion by not giving the jury the following proposed instruction: "There is no legal duty to report to the authorities that another person had committed a crime." The district court rejected the instruction, concluding that it was duplicitous with other instructions. We agree. The jury was instructed that mere presence at the scene or knowledge of a crime is insufficient to establish guilt and that mere knowledge or approval of or acquiescence in the purpose of a conspiracy is insufficient to impute criminal liability. In addition, the jury was instructed on the elements of the offenses and the prosecution's burden of proof. We conclude that these instructions sufficiently resolved McKnight's apparent concern that his convictions could rest upon his mere presence when the crimes occurred or his knowledge of them.

*Remaining instructions*

McKnight challenges two instructions given regarding implied malice and equal and exact justice; we have consistently upheld those instructions. *See, e.g., Leonard v. State*, 117 Nev. 53, 79, 17 P.3d 397, 413 (2001) (upholding implied malice instruction; *Leonard v. State*, 114 Nev. 1196, 1209, 969 P.2d 288, 296-97 (1998) (upholding equal and exact justice instruction). He also challenges the first-degree murder instruction (no. 26), specifically that portion relating to premeditation. The instruction as a whole comports with *Byford v. State*, 116 Nev. 215, 237-38, 994 P.2d 700, 714 (2000), and we are not persuaded to reconsider *Byford*.

*Sentencing evidence*

McKnight contends that the district court improperly admitted, during sentencing, a preliminary hearing transcript related to a

pending murder prosecution against him. Relying on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), he reasons that the prosecution improperly used that evidence to enhance his sentence to life without the possibility of parole. While the prosecution first introduced testimony regarding McKnight's pending murder prosecution, McKnight introduced the preliminary hearing transcript and therefore he cannot complain about its admission. Moreover, as his sentence fell within the statutory limits, *see* NRS 200.030(4)(b), evidence of a pending murder prosecution did not violate *Apprendi*. Further, evidence of a defendant's other crimes is admissible at sentencing as long as the evidence is not impalpable or highly suspect, *see Homick v. State*, 108 Nev. 127, 138, 825 P.2d 600, 607 (1992), and McKnight has not shown that evidence of his pending murder prosecution is impalpable or highly suspect.

Having considered McKnight's arguments and concluded that no relief is warranted, we

ORDER the judgment of conviction AFFIRMED.[7]

_____, J.
Saitta

_____, J.
Gibbons

_____, J.
Pickering

---

[7]McKnight argues that cumulative error requires reversal of the judgment of conviction. Because McKnight demonstrated only one error regarding the testimony of the Sprint/Nextel records custodian, there are no errors to cumulate.

Supreme Court
OF
Nevada

(O) 1947A

cc: Christopher R. Oram
Attorney General/Carson City
Clark County District Attorney
Eighth Judicial District Court
Eighth District Court Clerk