SHEILA ANN SUMMERS, Appellant *v.* THE STATE OF NEVADA, Respondent.

No. 15524

May 1, 1986                                            718 P.2d 676

[Rehearing denied September 4, 1986]

*Morgan D. Harris,* Public Defender, *Terrence M. Jackson,* Deputy, and *Craig D. Creel,* Deputy, Clark County, for Appellant.

*Brian McKay,* Attorney General, Carson City, and *Robert J. Miller,* District Attorney, *Nancy Oesterle,* Deputy, Clark County, for Respondent.

## OPINION

*Per Curiam:*

A jury found Sheila Ann Summers guilty of first degree murder with the use of a deadly weapon. The jury also found that the crime involved depravity of mind and sentenced Summers to death. Summers has raised several assignments of error. We are persuaded that the district court erred in admitting into evidence a suicide note implicating Summers in the murder which violated Summers' constitutional rights and constitutes reversible error. Accordingly, we reverse Summers' judgment of conviction and remand for a new trial.

## THE FACTS

On the evening of September 14, 1982, Joy Spinney visited her friend, Joan Mack, at Mack's trailer. Spinney had told her husband that Mack planned to travel to Florida the following day. From 11:00 p.m. that night until 2:30 a.m. the next morning, Spinney telephoned her husband four times from Mack's trailer. In their final telephone conversation, Spinney told her husband that she had been drinking continuously and that she planned to spend the night at Mack's trailer and then drive Mack to the airport in the morning.

Spinney's corpse was found on September 19, 1982 in the desert. An autopsy established that Spinney had been shot twice, once in the abdomen, and once in the right cheek. The cause of death was the shot to the right cheek. Spinney had been dead two and one-half to three days.

Officers of the Las Vegas Metropolitan Police contacted Spinney's husband on September 21, 1982, who told them that, when he last spoke to Spinney, she was at Mack's trailer. An officer who had telephoned Mack's trailer testified that Summers answered the telephone and said that she was house-sitting for Mack and that she did not know Spinney.

Robert Autry, an acquaintance of Summers', and a drug user, met Summers. Autry testified that Summers offered to sell him two guns which Summers told him had been used in a murder. Autry testified that Summers had said she wanted to get rid of the guns and would sell the guns for $100 each; that the victim of the shooting was a female. Summers told Autry that Mack had first shot the victim in the abdomen in Mack's trailer and that Summers then shot the victim in the head. Autry reported to officers of the Las Vegas Metropolitan Police what Summers had told him.

The Las Vegas Metropolitan Police taped a transmitter to Autry's chest with instructions to purchase the two guns that Summers had told him had been used to kill Spinney. The officers tape-recorded the conversation between Autry, Summers, and a Ted Hanson, Summers' boyfriend, as the three drove to the location in the desert where Summers had hidden the guns. During the course of that conversation, Summers stated: "[I]t wasn't stupid because she [Spinney] was half dead. . . . [S]o what else you gonna do, what do you do with a . . . horse who has a broken leg. Shoot it in the . . . brain, right? . . . [S]o that's all I did, was put her out of her . . . misery. I couldn't believe [Mack]. She . . . shot her right in the . . . liver . . . [Mack] shot her first. Then she called me in. . . ." After Summers had retrieved the two guns, Summers was arrested.

Mack was arrested on October 6, 1982 in Florida for Spinney's

murder. At trial, Autry testified that, several days after Summers' arrest, Summers telephoned him and told him that she was not worried because Mack was "going to take the whole rap." Mack's cellmate in Clark County Jail testified that Mack had told her that she had fired both shots but that she, Mack, planned to blame Summers for Spinney's murder.

Before the date of her own trial, Mack committed suicide. Prior to committing suicide, Mack wrote the following suicide note:

> Karen and Mike [the Las Vegas Metropolitan Police homicide detectives investigating Spinney's murder] and Heaven: I finally found a way not to ever be harassed again in my life, just to die. I'm too old and sick to go through a trial that is unnecessary at my State of Nevada's cost. I am not guilty of anyone's death. Sheila killed my best friend, Joy Spinney. Please, dear Lord, make her, Sheila, serve and die the death penalty. Please, please, please. Do justice for the guilty and that is Sheila Summers Domnisse. J. Mack.

At Summers' trial, Summers testified that she and Mack were casual acquaintances and that Summers had once met Spinney. She stated that Mack telephoned her and she drove to Mack's trailer. Mack answered the door with a revolver in her hand. She appeared drunk and disheveled. Behind Mack, Summers saw Spinney lying on the floor covered with a bloody sheet. When Summers asked Mack what had happened, Mack told her that "[Spinney] was not going to interfere in another relationship with her and Charlie (Mack's boyfriend). Mack then told Summers that if Summers "opened her mouth" she would harm Summers' children.

Summers further testified that she was forced at gunpoint to drag Spinney to Spinney's car, place her in the back seat, and drive the car. Summers tried to drive to Southern Memorial Hospital, but Mack pointed the revolver at her head and said, "No, you're not taking her there." Mack then directed Summers at gunpoint to a deserted spot outside of Las Vegas. After Summers stopped the car, Mack dragged Spinney several feet away from the car, shot Spinney, and then ordered Summers, once again at gunpoint, to drive back to Mack's trailer.

## THE GUILT PHASE

1. Summers asserts that the district court's denial of her motion opposing death-qualification of the jury violated her constitutional right to a fair trial.[1] Summers postulates that death-

---

[1] We note that Summers does not assert that the death-qualification of a particular juror was not conducted according to the guidelines set by the United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510

qualified juries are conviction-prone. In support of this postulation, Summers cites a number of journal articles which she alleges demonstrate that death-qualified juries are conviction-prone. From this postulation, Summers argues that death-qualified juries are not neutral and, therefore, that the death-qualification of the jury that tried her case violated her constitutional right to a fair trial.

In McKenna v. State, 101 Nev. 338, 705 P.2d 614 (1985), we stated: "[U]nder *Witherspoon,* we are not required to presume that a death-qualified jury is biased in favor of the prosecution. Rather, the accused has the burden of establishing the nonneutrality of the jury." We will not hesitate to hold that a criminal defendant's constitutional right to a fair trial has been violated when the defendant has met the burden imposed upon him by our decision in *McKenna*—that is, when the defendant has established the nonneutrality of the jury that convicted him. Summers has not, however, met that burden by merely citing a number of journal articles that she alleges demonstrate that death-qualified juries are conviction-prone. Consequently, we are unable to hold that the district court denial of Summers' motion opposing death-qualification of the jury violated her constitutional right to a fair trial.

2.   The district court conducted a collective voir dire of prospective jurors. The voir dire of each prospective juror was conducted within the presence of the remaining prospective jurors. Summers argues that the district court erred in denying her motion requesting the court to voir dire each prospective juror individually, that is, out of the presence of the remaining prospective jurors. Both the scope of voir dire (Cunningham v. State, 94 Nev. 128, 575 P.2d 936 (1978)) and the method by which voir dire is pursued (Wilkins v. State, 96 Nev. 367, 609 P.2d 309 (1980)) are within the discretion of the district court. *See* NRS 175.031. Absent a showing that the district court abused its discretion or that the defendant was prejudiced, we shall not disturb a district court's determination to conduct a collective voir dire of prospective jurors. Summers has made no such showing. We hold that the district court did not err in denying Summers' motion requesting the court to voir dire each prospective juror individually.

3.   Summers suggests that the district court erred in denying her motion to suppress the admission into evidence of the record-

(1968). Rather, Summers asserts that the district court erred in permitting the death-qualification of *any* of the jurors who sat on the panel that tried her case.

ings made from the October 5, 1972, "body bugging" of Autry and of the fruit derived therefrom. We must disagree.

In State v. Bonds, 92 Nev. 307, 550 P.2d 409 (1976), we held that the warrantless, electronic recording of a communication from a "transmitter-type listening device" attached to a police informant did not constitute the interception of either a wire communication[2] or an oral communication.[3] Consequently, we held that the interceptor of such a communication need not first secure an order permitting the interception. NRS 179.470; NRS 179.475. Such an interception must, however, satisfy the authorization requirements set forth in NRS 200.650.[4]

The recordings made from the October 5, 1982, "body bugging" of Autry are warrantless, electronic recordings of a communication from a "transmitter-type listening device" which, in Bonds, we held did not constitute the interception of either a wire communication or an oral communication. The interceptor of such a communication, therefore, need not first secure an order permitting the interception (NRS 179.470; NRS 179.475) so long as the authorization requirements set forth in NRS 200.650 are met. Autry authorized the interception. Consequently, we hold that the district court did not err in denying Summers' motion to suppress the recordings and the fruit derived therefrom.

4. During the State's rebuttal case, the district court, over Summers' objection, admitted into evidence Mack's suicide note

---

[2]NRS 179.455 defines "Wire communication" as:

[A]ny communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of intrastate, interstate or foreign communications.

[3]NRS 179.440 defines "Oral communication" as:

[A]ny verbal message uttered by a person exhibiting an expectation that such communication is not subject to interception, under circumstances justifying such expectation.

[4]NRS 200.650 provides:

Except as otherwise provided in NRS 179.410 to 179.515, inclusive, no person shall intrude upon the privacy of other persons by surreptitiously listening to, monitoring or recording, or attempting to listen to, monitor or record, by means of any mechanical, electronic or other listening device, any private conversation engaged in by such other persons, or disclose the existence, contents, substance, purport, effect or meaning of any such conversation so listened to, monitored or recorded, *unless authorized to do so by one of the persons engaging in the conversation.* (Emphasis added.)

implicating Summers in Spinney's murder.[5] The district court found Mack's suicide note admissible as a prior inconsistent statement for the purpose of impeaching Mack's cellmate who testified that Mack told her that Mack had fired both shots at Spinney and that Mack planned to blame Summers for Spinney's death.

The district court erred in admitting Mack's suicide note as a prior inconsistent statement for the purpose of impeaching Mack's cellmate. The rule permitting the admission of impeaching prior inconsistent statements requires that the impeaching prior inconsistent statements be statements made by the witness to be impeached. Dorsey v. State, 96 Nev. 951, 620 P.2d 189 (1979); McCormick on Evidence, Sect. 34 (3rd Ed. 1984). The witness the State sought to impeach in the instant case was Mack's cellmate. Mack's suicide note was written by Mack, not Mack's cellmate.

Neither is Mack's suicide note admissible as a prior inconsistent statement for the purpose of impeaching Mack. In Kaplan v. State, 99 Nev. 449, 663 P.2d 1190 (1983), we stated that "prior inconsistent statements are normally admissible for purposes of impeachment over hearsay objection . . . under NRS 51.035[6] . . . if two requirements are met: (1) the proffered statement is 'inconsistent' with the declarant's testimony; and (2) the declarant 'testified at the trial or hearing and is subject to cross-examination concerning the statement.' " Kaplan v. State, 99 Nev. at 451-452. See McCormick on Evidence, Sect. 34 (3rd Ed. 1984). Viewing Mack, in this instance, as the declarant, the second requirement enunciated in *Kaplan* as being prerequisite to the admission of an impeaching prior inconsistent statement is not satisfied. Mack did not testify at Summers' trial and was not subject to cross-examination concerning her suicide note.

Because Mack did not testify as a witness and was not subject to cross-examination (California v. Green, 399 U.S. 149 (1970);

---

[5]The district court did not admit into evidence the following sentence from Mack's suicide note: "Please, dear Lord, make her, Sheila, serve and die the death penalty."

[6]NRS 51.035 provides, in pertinent part:

"Hearsay" means a statement offered in evidence to prove the truth of the matter asserted unless:

\* \* \* \* \* \*

(2) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(a) Inconsistent with his testimony. . . .

Corbin v. State, 97 Nev. 245, 627 P.2d 862 (1981); Sparkman v. State, 95 Nev. 76, 590 P.2d 151 (1979); Levi v. State, 95 Nev. 746, 602 P.2d 189 (1979); Maginnis v. State, 93 Nev. 173, 561 P.2d 922 (1977)), the district court's error in admitting Mack's suicide note violated Summers' right to be confronted with the witnesses testifying against her, a right secured by the confrontation clause of the Sixth Amendment[7] and made obligatory on the States by the Fourteenth Amendment (Pointer v. Texas, 380 U.S. 400 (1965); Summit v. State, 101 Nev. 159, 697 P.2d 1374 (1985); Messmore v. Fogliani, 82 Nev. 153, 413 P.2d 306 (1966)).

A violation of the rights secured by the confrontation clause of the Sixth Amendment will not automatically require a reversal of a criminal conviction: Where the properly remaining admitted evidence of guilt is overwhelming, the out-of-court declarant's statement cumulative, and the prejudicial effect of the statement insignificant by comparison so that it is clear beyond a reasonable doubt that the improper admission of the statement was harmless error, we shall not reverse the conviction. However, reversal is mandated where the evidence of guilt is woven from circumstantial evidence and it is not established beyond a reasonable doubt that the admission of the statement was harmless error. Stevens v. State, 97 Nev. 443, 634 P.2d 662 (1981); Corbin v. State, 97 Nev. 245, 627 P.2d 862 (1981); Davies v. State, 95 Nev. 553, 598 P.2d 636 (1979).

Summers' guilt was predicated on circumstantial evidence. The State concedes that Mack fired the first shot. No physical evidence introduced at trial shows that Summers fired the second shot. Aside from Mack's suicide note, the only other evidence introduced at trial that indicates that Summers fired the second shot is the testimony of Autry, a drug user, and the recording made when Summers was purportedly drugged and intoxicated. The remaining evidence of Summers' guilt is not overwhelming. The prejudicial effect of the admission of Mack's suicide note is not so insignificant by comparison that we are able to hold that it is clear beyond a reasonable doubt that the admission of the suicide note was harmless error. Stevens v. State, 97 Nev. at 443; Corbin v. State, 97 Nev. at 245; Davies v. State, 95 Nev. at 553.

---

[7]"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

Accordingly, the improper admission of Mack's suicide note mandates that we reverse Summers' judgment of conviction and remand for a new trial.[8]

---

[8]It appears from the record that the trial judge may have sought to balance the testimony of Mack's cellmate, Ethyl Louise Callier, by the admission of Mack's suicide note. Upon retrial, if the State objects to Callier's testimony concerning Mack's alleged admission, the trial judge will have to determine whether there are sufficient corroborating circumstances to indicate clearly the trustworthiness of the alleged statement to Callier by Mack. NRS 51.345.