GERALD JOSEPH AESOPH, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 16540

June 26, 1986

721 P.2d 379

Goodman, Terry, Stein & Quintana and William H. Smith, Las Vegas, for Appellant.

Brian McKay, Attorney General, Carson City; A. D. Demetras, District Attorney, Nye County, for Respondent.

## OPINION

*Per Curiam:*

Following a jury trial, appellant Gerald Aesoph was convicted of first degree murder, burglary and robbery with use of a deadly weapon. After review of Aesoph's assignments of error, we conclude that prosecutorial misconduct constituted reversible error. Accordingly, we reverse and remand for a new trial.

### THE FACTS

On the evening of April 28, 1982, Gerald Aesoph shot and killed William Apfel, aka Bill Martin, in Apfel's home. At trial, Aesoph claimed that he shot Apfel in self-defense. The state argued that Aesoph committed premeditated murder. Except for Aesoph, there were no witnesses to the actual shooting. Thus, Aesoph's defense depended heavily upon his credibility before the jury.

After shooting Apfel, Aesoph forced Beverly Blair Bruce (Blair), Apfel's live-in lover, to accompany him to the Coach House Bar. Apfel owned the Coach House Bar and the Shamrock brothel which were located adjacent to Aesoph's residence in Lathrop Wells, Nevada. At the Coach House Bar, Aesoph ordered Blair to get money out of the safe. Aesoph testified that Apfel owed him money and that Aesoph believed the money belonged to him.

Aesoph and Blair then got into his car and headed south. The police apprehended and arrested Aesoph shortly thereafter.

The jury found Aesoph guilty of first degree murder, burglary and robbery with use of a deadly weapon. During the penalty phase, the jury rejected the imposition of the death penalty and sentenced Aesoph to life with the possibility of parole for the murder conviction. The district court then sentenced Aesoph for the remaining convictions. Aesoph appeals the judgment of conviction.

### QUALIFICATION OF JURORS IN A DEATH PENALTY CASE

Prior to trial, the state filed a notice to seek imposition of the

death penalty. During voir dire all members of the venire were asked whether, upon a finding of guilty, they would be able to consider the death penalty as a possible punishment, *i.e.*, the jury was "death qualified." The district court excluded for cause a prospective juror who stated that he could not impose the death penalty. On appeal, Aesoph argues that the "death qualification" of the jury deprived him of an impartial jury and a fair trial in violation of the sixth and fourteenth amendments. Aesoph's argument is two-pronged.

First, Aesoph contends that a "death qualified" jury is more likely to be conviction-prone. Aesoph contends that this violated his right to an impartial jury.[1]

In McKenna v. State, 101 Nev. 338, 705 P.2d 614 (1985), *cert. denied,* 106 S.Ct. 868 (1986) we held that under Witherspoon v. Illinois, 391 U.S. 510 (1968), we are not required to presume that a "death qualified" jury is biased in favor of the prosecution. The accused has the burden of establishing the nonneutrality of the jury. *McKenna,* 101 Nev. at 344. Aesoph failed to meet his burden of proof to establish the nonneutrality of the jury who convicted him. Summers v. State, 102 Nev. 195, 718 P.2d 676 (1986). *McKenna,* 101 Nev. at 344.

Aesoph next contends that the removal for cause of persons of a distinct and sizable group, the *"Witherspoon-*excludables," *i.e.,* persons who because of their attitudes and beliefs are unalterably opposed to the death penalty, violated his rights under the sixth and fourteenth amendments to a jury selected from a representative cross-section of the community.[2] Aesoph argues that this systematic exclusion of *"Witherspoon-*excludables" violated his right to an impartial jury.

We recognize that a defendant has a right to a jury selected from a representative cross-section of the community. *See* Lockhart v. McCree, ____ U.S. ____, 106 S.Ct. 1758, 1764 (1986). But this fair cross-section requirement does not extend to the petit

---

[1]Aesoph does not assert that the canvass and "death qualification" of the jury and exclusion of any prospective juror was not conducted pursuant to the standards established by Wainwright v. Witt, ____ U.S. ____, 105 S.Ct. 844 (1985) and Witherspoon v. Illinois, 391 U.S. 510 (1968). Rather, Aesoph's objection is to the "death qualification" per se of any prospective juror during the guilt phase of trial.

[2]In his arguments, Aesoph refers to this type of prospective juror by the term *"Witherspoon-*excludables." We will refer to this particular group by this term in this opinion. Lockhart v. McCree, ____ U.S. ____, 106 S.Ct. 1758, 1761, fn. 1 (1986).

jury itself, as opposed to jury panels or venires. *Lockhart,* 106 S.Ct. at 1764-1765.

Even if this requirement did extend to petit juries, "death qualification" would not violate that requirement. *Lockhart,* 106 S.Ct. at 1765. The basis for the removal for cause of a "*Witherspoon*-excludable" is an attitude or belief, within the individual's control, which prevents or substantially impairs members of this group from performing one of their duties as jurors. *Lockhart,* 106 S.Ct. at 1766. The right to a representative jury does not include the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge. *Lockhart,* 106 S.Ct. at 1766; Lockett v. Ohio, 438 U.S. 586, 597 (1978). Groups, such as the "*Witherspoon*-excludables," which are defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, are not "distinctive groups" for fair cross-section purposes. *Lockhart,* 106 S.Ct. at 1765. Thus, exclusion of prospective jurors who fall into such a group does not contravene any of the basic objectives of the fair cross-section requirement. *Lockhart,* 106 S.Ct. at 1766. We hold that "death qualification" does not violate the fair cross-section requirement. *Id.*

We hold that a person's constitutional right to a fair trial is not violated by the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of trial. Lockhart v. McCree, 106 S.Ct. 1758 (1986). The "death qualification" of the jury did not violate Aesoph's constitutional rights to an impartial jury and to a fair and impartial trial.

### PRELIMINARY HEARING TESTIMONY

Aesoph contends that the admission at trial of a witness's preliminary hearing testimony violated his constitutional right to confront witnesses. We disagree.

At the preliminary hearing, Dr. Green, the pathologist who performed Apfel's autopsy, testified as to the nature of Apfel's gunshot wounds and cause of death. Aesoph was represented by counsel who cross-examined Dr. Green. Aesoph concedes that Dr. Green was actually unavailable at the time of trial.

NRS 171.198(7) governs the admissibility of preliminary hear-

ing testimony at trial.[3] In Drummond v. State, 86 Nev. 4, 462 P.2d 1012 (1970), we enunciated three preconditions that must be met before a witness's preliminary hearing testimony may be received in evidence during trial: first, that the defendant was represented by counsel at the preliminary hearing; second, that counsel cross-examined the witness; third, that the witness is shown to be unavailable at the time of trial. All three of these preconditions were met in the case at bar. Moreover, we observe that Dr. Green's preliminary hearing testimony was a thorough account of his autopsy findings and pathology report. The cause and manner of death was not at issue at trial. Thus, Aesoph failed to demonstrate any prejudice at trial as a result of the admission of Dr. Green's preliminary hearing testimony.

We conclude that Aesoph's argument lacks merit. The district court properly allowed the use of the preliminary hearing testimony at trial pursuant to NRS 171.198(7).

### PROSECUTORIAL MISCONDUCT

Next we consider whether Aesoph's fifth amendment right against self-incrimination and his fourteenth amendment due process right to a fair and impartial trial were violated. During the state's case-in-chief, the prosecutor elicited the testimony of police officers that after they had arrested Aesoph and had given him the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966) that Aesoph chose to exercise his constitutional right to remain silent.[4] In addition to focusing the jury's attention on

---

[3]NRS 171.198(7) provides:

The testimony so taken may be used:
(a) By the defendant; or
(b) By the state if the defendant was represented by counsel or affirmatively waived his right to counsel,
upon the trial of the cause, and in all proceedings therein, when the witness is sick, out of the state, dead, or when his personal attendance cannot be had in court.

[4]On three separate occasions, the prosecutor elicited testimony concerning Aesoph's post-arrest, post-*Miranda* silence. The impermissibility of the prosecutor's line of questioning is exemplified by the following exchange:

Q: Did you give him any *Miranda* rights?
A: Yes, I did. I read him his *Miranda* rights.
Q: Had he said anything prior to the time that you found the money? Did he —
A: After I had read him his rights, he indicated that he wanted an attorney and did not wish to speak to us.
Q: Okay. What were the *Miranda* warnings that you gave him? Do you recall?
A: What were they?
Q: Yes. Can you repeat them?
　　　　* * * *
A: You have the right to remain silent. Anything you say can and will be used against you in a Court of law. ·
You have the right to talk to a lawyer and have him present with you

Aesoph's election of his right to remain silent, the prosecutor's questioning and later comments also served to impeach Aesoph's credibility.[5]

It is constitutionally impermissible to admit evidence of a defendant's invocation of his fifth amendment right to remain silent. Miranda v. Arizona, 384 U.S. 436, 468 fn. 37 (1966). *See also,* McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984); Franklin v. State, 98 Nev. 266, 646 P.2d 543 (1982). Moreover, prosecutorial comment on a defendant's post-arrest, post-*Miranda* silence for substantive or impeachment purposes is constitutionally prohibited as it violates a defendant's due process right to a fair trial. *See,* Wainwright v. Greenfiled, ...... U.S. ......, 106 S.Ct. 634 (1986); Doyle v. Ohio, 426 U.S. 610 (1976). The implicit assurance contained in the *Miranda* warnings is that silence will carry no penalty. *Doyle,* 426 U.S. at 618. What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the state's assurance that the invocation of those rights will not be penalized. *Wainwright,* 106 S.Ct. at 641. We find that in addition to violating Aesoph's right against self-incrimination, the prosecutor's use of Aesoph's post-arrest, post-*Miranda* silence was fundamentally unfair and vio-

---

while you are being questioned. If you cannot afford to hire a lawyer, one will be — one will be appointed to represent you before any questioning, if you wish.

You can decide at any time to exercise these rights and not answer any questions or make any statements.

And then there is the actual waiver which is: Do you understand each of these rights as I have explained them to you and having these rights in mind, do you wish to talk to us now?

Q: Did he say anything after that?

A: He indicated he did understand his rights and he indicated he did not want to talk to us.

[5]In his closing argument to the jury the prosecutor made the following vituperative comment:

They didn't have to say anything. They sit back and watch and what you have tied down, they twist. What we have proved beyond a doubt that the bullet came out of the gun is, oh, well, sure [sic]; that the chase ran into Inyo, was forced to a stop, because we can prove it and we did so they have to build a defense around what we have. You have to understand this. They don't have to say anything. They could just sit here and rap, rap, rap and complain about the bad law enforcement and fit their story to ours because we got to go first. You got to keep that in mind.

How many times did Beverly Blair say different things? She was interrogated by Flud, I believe Adams, I believe the other people and she had some discrepancies.

How many times was Aesoph interviewed? Any guesses? Zero.

Although the court sustained the defense counsel's objection and gave the jury a curative instruction, by this time the prejudicial effect of the prosecutor's comments was irreparable.

lated Aesoph's due process right to a fair and impartial trial. Wainwright v. Greenfield, ...... U.S. ......, 106 S.Ct. 634 (1986); Doyle v. Ohio, 426 U.S. 610 (1976).

We are unable to conclude that this was harmless error. The issue at trial was whether or not Aesoph shot Apfel in self-defense. The evidence was circumstantial. Aesoph's credibility before the jury was crucial to his defense. The prosecutor's references to Aesoph's post-arrest, post-*Miranda* silence were pervasively repeated throughout the trial. Absent these prosecutorial comments, it is not clear that the jury would have reached the same verdict. We are unable to state that the error was harmless beyond a reasonable doubt. *See,* Moore v. State, 96 Nev. 220, 607 P.2d 105 (1980); Chapman v. California, 386 U.S. 18, 24 (1967).

Aesoph further contends that the prosecutor's injection of his personal beliefs and opinions during closing arguments constituted prosecutorial misconduct. We agree.

We have consistently held that prosecutors must not inject their personal beliefs and opinions into their arguments to the jury. Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985); McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984); Owens v. State, 96 Nev. 880, 620 P.2d 1236 (1980). As we stated in *Collier,*

> Such an injection of personal beliefs into the arguments detracts from the "unprejudiced, impartial, and nonpartisan" role that a prosecuting attorney assumes in the courtroom. [Citation omitted.] By stepping out of the prosecutor's role, which is to seek justice [citation omitted], and by invoking the authority of his or her own supposedly greater experience and knowledge, a prosecutor invites undue jury reliance on the conclusions personally endorsed by the prosecuting attorney. [Citations omitted.]

*Collier,* 101 Nev. at 480.

In the case at bar, the prosecutor, continually injected his beliefs and opinions throughout his closing arguments.[6] This could only serve to influence the jury to rely upon the prosecutor's expertise and authority, rather than objectively weighing the

---

[6]We observe that the prosecutor's expression of his opinions permeated his closing argument. We set forth some of the more egregious examples:

In the instructions you will see a definition of an expert. That was Atkinson and that was his job here and he did it in my opinion very well. . . . As the testimony proceeded through the trial, it became apparent that we had proved that in my opinion and I found my experience when they say: "Oh, well, sure, I fired the shots but I didn't mean it," but in my opinion they would not have said that if we hadn't had Atkinson who said those bullets come [sic] out

evidence. To permit this prosecutorial misconduct was error. *Collier,* 101 Nev. at 481. We need not decide whether standing alone this prosecutorial misconduct would warrant reversal. The cumulative effect of this misconduct aggravated the prejudicial impact of the prosecutor's comments on Aesoph's post-arrest, post-*Miranda* silence and mandates reversal.

We conclude that Aesoph's constitutional right to a fair and impartial trial was violated. Accordingly, we reverse and remand for a new trial.

of that gun. They would never have admitted that shooting. That's my opinion.

\* \* \* \*

Those other two shots, they say, self-defense, fell down [sic]. He fell down when the one hit him in the back of the head.

Okay. Well, I don't believe that either but when he went out and came back in the house and he shoved this Beverly Blair towards that door and fired within a distance of twelve to eighteen inches into his skull right here, that was premeditated, deliberate and a malicious act of Murder. That's it. That's the shot that should give him that charge. That proves it to me in my opinion beyond any doubt.

\* \* \* \*

You have to find, in my opinion, Ladies and Gentlemen, that Robbery is committed and he used that deadly weapon to commit it, to terrorize that woman.