859 P.2d 1050 (1993)
Roger A. LIBBY, Appellant,
v.
The STATE of Nevada, Respondent.
No. 21271.
Supreme Court of Nevada.
September 9, 1993.
*1052 James J. Jackson, State Public Defender, and Janet S. Bessemer, Deputy Public Defender, Carson City, for appellant.
Frankie Sue Del Papa, Atty. Gen., and Stuart J. Newman, Deputy Atty. Gen., Carson City, for respondent.

OPINION
ROSE, Chief Justice.

Facts
In August of 1988, Charles Beatty (Beatty) moved to Winnemucca, Nevada. He secured employment at the Pinson Mine and moved into a house at 14 South Street. Beatty's 24-year-old nephew, James Robertson (Robertson), came with Beatty to stay for a couple of weeks. Robertson had several physical disabilities as a result of contracting Hodgkin's disease (cancer of the lymph glands) when he was 13 years old, including partial paralysis, a deformed shoulder, and impaired speech that rendered him unable to scream. He also wore a leg brace for an injury caused by a motorcycle accident.
On September 14, 1988, Beatty was not seen at work and did not answer his telephone at home. On September 22, 1988, his and Robertson's bodies were found in the desert. Beatty's fully-clothed body had been stuffed into a trash bin, with his feet exposed. He had been shot in the back of the head at the base of his skull in an upward direction. Robertson's body, clothed only in a pair of white jockey shorts, was wrapped in blankets and lay in a ravine. He had been shot in the top of his head in a downward direction, and his throat had been cut. Because Robertson's body had begun to decompose, the examining physician could not determine the exact path of the bullet, how long Robertson remained alive or conscious after he was shot, or whether the throat wound was inflicted post-mortem.
A law enforcement team investigated Beatty's residence. At trial, a blood specialist testified that the blood found on a headboard in the back bedroom was "consistent with that of [Robertson]," to the exclusion of Libby and Beatty. In the same bedroom, Agent Robert Milby found.22 caliber cartridge casings on the floor under a mattress. Blood of a type consistent with that of Beatty was discovered in front of the television in the living room.
On September 24, 1988, Renee Montgomery (Montgomery) approached the investigators on South Street and asked if the house was ready to rent. She explained to a police officer that she had spoken to a man named Roger Libby (Libby) in the early morning of September 14, 1988. Montgomery had known Libby since June of 1988; he was a customer of the casino where she worked as a bartender. Libby shared her room at the Winners Hotel in Winnemucca when there were no rooms available in town. After Labor Day weekend, Libby told Montgomery he was going to stay with Charles Beatty. On September 14, 1988, he told her that he was returning to Moberly, Missouri, that Beatty was returning to Wyoming, and that they wanted to rent the house to her. Late that night, he showed her the house, except the room in which Robertson slept, which he told her was a mess. Montgomery then went back to the casino and did not see Libby again.
On September 24, 1988, Missouri police located Beatty's Chevrolet Blazer in Higbee, Missouri, and arrested Libby as he approached the vehicle. Troopers Don Ancell and Kevin Hyatt searched the front portion of the Blazer for weapons. They found Beatty's checkbook and wallet in the pocket of the passenger side door. Inside *1053 the checkbook were bank cards in Beatty's name. Missouri police officers later found a wallet in Libby's possession, which contained Beatty's Nevada driver's license, Beatty's bank cards, Beatty's First Interstate Bank automatic teller machine card, and Libby's own identification card. The four digit PIN number which accesses the account was on a piece of paper in the wallet. The next day, Ancell went to the residence of Libby's friend in Higbee and found several stereo components and other items which belonged to Beatty. At Libby's place of employment in Missouri, police recovered several tools inscribed with the name Charles Beatty.
On September 26, 1988, Agent Milby and other Nevada law enforcement officers traveled to Missouri to continue the investigation. They searched the Blazer and discovered a .22 caliber rifle and a box of .22 caliber ammunition. At trial, a criminal specialist testified that the bullet fragments found in the victims' bodies "were small and consistent with a .22 caliber bullet or something very, very close to it." Blood of a type consistent with that of Beatty was on the Blazer's carpet.
Several weeks later, police discovered that someone had made three withdrawals from the automatic teller using Beatty's Winnemucca bank account. One withdrawal occurred in Winnemucca on September 14, 1988, and the next two were in Las Vegas on September 15, 1988. The same white male individual was shown on video tape using the machines. The jury viewed all of the tapes and thus had the opportunity to identify the user of the machines.
The State filed a felony complaint against Roger Libby, charging him with two counts of murder with the use of a deadly weapon, three counts of robbery with the use of a deadly weapon, and five counts of grand larceny. The State also filed notice of its intention to seek the death penalty. On February 6 and 7, 1990, the trial court heard several motions to suppress evidence, including a motion to suppress Libby's statements to Agent Milby and late Winnemucca Police Chief Reed Hayes. The court granted the motion in part, suppressing the statements to Hayes because Libby had requested an attorney during the interview. The State appealed the decision, and this court dismissed the State's appeal (State v. Libby, 106 Nev. 1041, 835 P.2d 65 (1990). The trial commenced on April 5, 1990, and on April 17, 1990, Libby was convicted of two counts of first degree murder with the use of a deadly weapon and five counts of grand larceny. He was sentenced to death on both murder counts.[1] This appeal followed.
Libby alleges that numerous errors occurred during each phase of the trial. Of greatest significance are the following: (1) the admission of photographs of the victims' bodies; (2) the granting of the prosecutor's motion in limine to prohibit questioning regarding the victims' drug use; (3) the district court's decision to rule on Libby's motion to disqualify the judge for bias, rather than appoint another judge to rule on the motion; (4) the denial of Libby's motions to change venue; (5) the refusal to allow supplemental voir dire regarding the jurors' knowledge of pretrial publicity; (6) the introduction into evidence of the pants Beatty wore the day he was killed; (7) the admission of evidence of victim characteristics, such as scholastic achievement; and (8) the fact that the jury instruction regarding depravity of mind has since been declared unconstitutionally vague. We conclude that none of these alleged errors warrants reversal.

*1054 Admission of Photographs Into Evidence

Libby argues that the district court abused its discretion in admitting into evidence color photographs of the victims' bodies. The State used the photographs to demonstrate the manner in which the bodies were deposited at the desert sites, the location of the gunshot wounds, the proximity of the barrel to the victims' heads, and the slit in Robertson's throat.
The district court has discretion to admit photographs into evidence, as long as their probative value is not substantially outweighed by their prejudicial effect. Dearman v. State, 93 Nev. 364, 370, 566 P.2d 407, 410 (1977). Because the photographs depicted exactly what the expert described and were helpful in assisting the jury in understanding the nature of the murders and the circumstances of the crime, we conclude that the district court did not abuse its discretion. See Robins v. State, 106 Nev. 611, 623, 798 P.2d 558, 566 (1990), cert. denied Robins v. Nevada, ___ U.S. ___, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991); Azbill v. State, 88 Nev. 240, 250, 495 P.2d 1064, 1070 (1972).

Limitations on Cross-Examination
Libby contends that the district court erred in refusing to permit defense counsel to question Montgomery about her drug use and about any drug use by the victims. Before trial, the State made an oral motion to prevent the defense from inquiring about these matters. Immediately prior to Montgomery's testimony, the court granted the State's motion, deeming the evidence irrelevant. Defense counsel then stated that if the questioning did become relevant, he assumed he could "renew the issue." Yet defense counsel did not raise this issue again during the trial. We conclude that by failing to do so, the defense waived the right to raise this issue on appeal. See Garner v. State, 78 Nev. 366, 374 P.2d 525 (1962) (failure to object, assign misconduct, or request an instruction will preclude review by this court).
This court may review errors which are patently prejudicial, however, regardless of counsel's failure to object. Sipsas v. State, 102 Nev. 119, 716 P.2d 231 (1986). Plain error is error which either (1) had a prejudicial impact on the verdict when viewed in context of the trial as a whole, or (2) seriously affects the integrity or public reputation of the judicial proceedings. McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984). Because Libby fails to demonstrate either that the State's case hinges on the reliability of Montgomery's testimony or that any drug use would have created a viable defense, we conclude that no prejudice resulted from the alleged error.

Motion to Disqualify the District Court Judge
Before trial, Libby made an oral motion to disqualify Judge Sullivan, based on the following comments made by him at a previous bail hearing: "[t]here was a capital offense. If I were to consider the confession I would find that beyond a reasonable doubt that he had done this." Libby alleged that Judge Sullivan's comments demonstrated bias toward the merits of his case. In denying the motion, the judge stated that his statement was taken out of context and that he was not biased. Libby now argues that Judge Sullivan erred in refusing to follow the statutory provisions set forth in NRS 1.235.
NRS 1.230(1) provides that "[a] judge shall not act as such in an action or proceeding when he entertains actual bias or prejudice for or against one of the parties to the action." Any party seeking to disqualify a judge for actual or implied bias or prejudice must file an affidavit specifying the facts upon which the disqualification is sought. NRS 1.235(1). The defense attorneys failed to file a written affidavit and thus did not comply with the statutory requirements. However, Judge Sullivan granted defense counsel leave to proceed on sworn testimony rather than by affidavit. Although the district court erred in failing to follow the procedure mandated by the statute and have another judge determine whether Judge Sullivan was biased, we conclude that the error was harmless. *1055 The allegedly biased comment was not a basis for the disqualification of a district judge, and there is no indication of bias during any phase of the trial.

Motion to Change Venue
Libby argues that the district court erred by denying his motion to change venue due to pretrial publicity. Following jury selection in January, 1990, the start of trial was delayed due to the State's interlocutory appeal of the order suppressing Libby's self-incriminating statements to the authorities following his arrest. On January 26, 1990, Libby moved for a change of venue based on pretrial publicity, arguing that a fair trial was impossible because there was extensive publicity relating to the interlocutory appeal. The district court denied the motion. Immediately prior to the start of the jury trial on April 5, 1990, Libby renewed his motion for a change of venue. He presented copies of several issues of the local newspaper and transcripts of news broadcasts by a local radio station, all published or broadcast between January 26, 1990, and April 2, 1990. Several of these Humboldt Sun news articles included facts about the killings, discovery of the bodies, Libby's arrest, and jury selection. The articles also discussed the defense's motion to suppress the audio-taped discussions between Libby and Chief Hayes, the fact that the Nevada Supreme Court would be hearing the interlocutory appeal regarding the "confession" made during these discussions, and finally, the entry of an order by this court affirming the suppression of the evidence.
On application of the defendant or the State, a criminal action may be removed from the court to which it has been assigned if a fair and impartial trial cannot be had in the county where the indictment, information, or complaint is pending. NRS 174.455(1). The decision of whether to grant or deny a change of venue should not be reversed on appeal absent a clear demonstration of an abuse of discretion. Ford v. State, 102 Nev. 126, 130, 717 P.2d 27, 29 (1986). The appellant has the burden of showing that publicity corrupted the trial or prejudiced a juror. Rogers v. State, 101 Nev. 457, 462, 705 P.2d 664, 668 (1985), cert. denied, Rogers v. Nevada, 476 U.S. 1130, 106 S.Ct. 1999, 90 L.Ed.2d 679 (1986).
In the case at bar, all of the jurors testified that they would be fair and impartial and that publicity had no effect on their ability to decide the case. See Burns v. State, 96 Nev. 802, 804, 618 P.2d 881, 883 (1980) (district court did not err in refusing to dismiss two jurors who had heard of the publicity but who stated they had not been influenced by it). In light of the discussion which follows, we conclude that Libby failed to demonstrate prejudice. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959).

Failure to Dismiss Two Jurors and Refusal to Allow Supplemental Voir Dire of Other Jurors
Libby contends that the district court erred in refusing to permit individual voir dire to determine the extent of juror exposure to publicity. The jurors were selected in early February, 1990, and on several occasions, they were instructed and admonished, pursuant to NRS 175.121, not to discuss the case or to listen to any news or conversation about the case. Soon after the jury was impaneled and sworn in, however, the State filed the interlocutory appeal regarding the "confession" Libby made during his discussion with Chief Hayes.
The jury was brought back almost two months later, in April, 1990. The district court again admonished them and conducted a group voir dire, inquiring as to whether any of the jurors had heard any information regarding the case. One juror raised his hand. The judge asked the other jurors to step out, and he questioned Mr. Scott, the individual who raised his hand. Mr. Scott told the judge that one week earlier, he read something about a confession in the Humboldt Sun. The court excused Mr. Scott. Counsel for the defense then renewed their motion for change of venue and asked for permission to question individual *1056 jurors. According to defense counsel, a female juror had asked a local attorney, Virginia Shane, about the confession, and a male juror had asked his supervisor, Norman Sweeney, about the confession.
The judge first called Norman Sweeney to the stand. Sweeney stated that one of his employees, Frank Gastelecutto, was on the prospective panel and that Gastelecutto told him that the week before, he had been listening to the radio when he heard a preface to the news broadcast that the prospective jurors were not to listen. According to Sweeney, Gastelecutto told him that this preface surprised him and he supposed he was to get up and run out of the room. He did not indicate whether he left the room. Counsel for defense requested, but the court denied, individual voir dire of Gastelecutto. Gastelecutto was an alternate juror and he did not participate in deliberation of Libby's case.
Next, Virginia Shane was called to the stand. She stated that juror "Sue Smith" (Shane called her "Sue Smith," but it is clear from the record that she meant "Sue Brown") had asked her if she knew how long it was going to take the Nevada Supreme Court "to rule on thisI don't know if she used the word confession. I think she used the word confession." According to Shane, Smith told her she had read about the confession in the paper, and Shane told her she was not supposed to be reading the paper. Juror Susan Brown was then questioned by defense counsel about her conversation with Shane. Brown said she had inadvertently read the last line of an article regarding the time frame of this court's decision, but she did not know why the matter came to this court. She said she could still be fair and impartial. Brown ultimately was involved in the deliberations of the case. Because Brown was questioned individually and consistently maintained that she could be fair and impartial, the district court did not err in refusing to dismiss her. Gastelecutto was not involved in the ultimate decision of the case and any error in retaining him as an alternate juror was harmless.
Although the scope and method of voir dire are within the discretion of the district court, Summers v. State, 102 Nev. 195, 199, 718 P.2d 676, 679 (1986), a defendant must be permitted reasonable voir dire of the prospective jurors. NRS 175.031; Milligan v. State, 101 Nev. 627, 708 P.2d 289 (1985). The district court should have allowed defense counsel to question the other jurors individually, even though this examination was supplemental in nature, concerning a specific point. We conclude, however, that the error was harmless. See Hui v. State, 103 Nev. 321, 323, 738 P.2d 892, 894 (1987). The court performed a thorough examination and admonishment of the jurors once the trial reconvened, and the district judge asked the specific questions at issue: to wit, whether the jurors had heard anything about the case while they temporarily were recessed. Moreover, there is no indication of juror prejudice against Libby. See Summers v. State, 102 Nev. 195, 718 P.2d 676 (1986).

Beatty's Pants
Libby argues that the district court erred in allowing the jury to see Beatty's bloodstained, malodorous pants. The State wished to show the jury that a belt loop on the pants was torn when Libby removed Beatty's keys from the loop. Libby contends the pants lacked probative value and were unduly prejudicial because they unnecessarily inflamed the passions of the jury.
The indictment alleged that Libby robbed Beatty by taking Beatty's keys from his person or in his presence. At trial, both Beatty's ex-wife and his former mother-in-law testified that Beatty usually kept his keys on a belt loop on his pants. Therefore, the pants were relevant to support the State's theory that Libby robbed Beatty by yanking Beatty's car keys from a belt loop on his pants. The district court allowed the State to submit the pants, on the condition that the jury would not take them back into the jury room and that Agent Milby would only show them from the witness chair. In light of the pants' relevance and the fact that the jury was allowed to *1057 see the pants only from a distance, we conclude that the district court did not abuse its discretion in finding that the pants' probative value outweighed any prejudicial effect. See NRS 48.035.

Characteristics of the Victims and Victim Impact Evidence
Libby argues that the admission of certain evidence was improper because it revealed characteristics of the victims. He also contends that the prosecutor improperly referred to victim characteristics by mentioning Beatty's family and Robertson's helplessness because he wore a brace to walk and could not scream out for help. We disagree.
The State introduced testimony at the guilt phase to establish Robertson's substantial physical handicaps caused by Hodgkin's disease and also to establish that he was sufficiently intelligent to secure a two-year college degree. This evidence and a photograph of Robertson at his graduation were received into evidence without objection from Libby. Robertson's sister also testified that Robertson was elected student of the year by his fellow students prior to graduation. When the student of the year certificate was offered into evidence, Libby objected on grounds that the evidence was not relevant and cumulative. The judge overruled the objection and the certificate was admitted.
Evidence of a victim's character or trait of character is not admissible unless specifically brought into issue. See Coombs v. State, 91 Nev. 489, 490, 538 P.2d 162, 162-63 (1975). However, facts establishing a victim's identity and general background are not what is generally referred to as character evidence and are admissible. The evidence about Robertson that Libby complains of falls into the latter category. Further, the evidence was relevant to the question of how the murders were perpetrated, which was one of the primary factual issues to be determined. The physical and mental capabilities of the victims were relevant to this inquiry and were properly admitted. Likewise, the prosecutor's statement that Robertson's handicaps rendered him helpless was not error.
Receipt of the student of the year certificate was more in the nature of character evidence. However, Robertson's receipt of this award was testified to without objection by Libby. While this evidence should not have been received, we do not believe that its admission prejudiced Libby in this case.
During the guilt phase of the trial, a photograph of Beatty showing him with his former wife and young children was received into evidence without objection. This photograph was found in the wallet that was in Libby's possession when he was arrested, along with other identification indicating that the wallet belonged to Beatty. During closing arguments at the sentencing phase, the prosecutor briefly referred to the fact that the victims, as well as Libby, had friends and family. Specifically, he stated:
[H]e [Libby] has family. He has friends. They love him. That's natural.
The victims had family and friends who loved [them] as well. Does that go to the degree of his moral culpability? The State suggests that it does not and we ask that you disregard that, as well.
The receipt into evidence of Beatty's photograph and the remarks of the prosecutor were appropriate. The photograph was admitted to show that the wallet in Libby's possession belonged to Beatty. Although Libby argues that there were credit cards and other evidence to establish this fact, whether this photograph should have been held inadmissible on the ground of being cumulative was within the sound discretion of the district court judge. See Yates v. State, 95 Nev. 446, 449-50, 596 P.2d 239, 241-42 (1979). It was relevant, and we find no abuse of discretion.
In his closing argument at the penalty phase, the prosecutor merely commented about the victims' family and friends in response to the evidence from Libby's family and in response to the argument of Libby's counsel. These comments did not *1058 constitute victim impact evidence as such evidence is generally understood. Further, even if these statements were considered to be arguing victim impact evidence, such evidence should not be excluded per se because it is relevant to a jury's assessment of the specific harm caused by the crime and determination of the punishment to be imposed. See Payne v. Tennessee, ___ U.S. ___, ___, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991). Therefore, Libby's complaint about the admission of the alleged character and victim impact evidence is without merit.

Depravity of Mind Instruction
NRS 200.033(8) allows for the finding of an aggravating circumstance in cases where the murder involves torture, depravity of mind, or mutilation of the victim. Since Libby's trial, this court has reconsidered the constitutionality of NRS 200.033(8). In Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980), the Supreme Court held that states imposing the death penalty must limit the jury's discretion with clear and objective standards that provide specific and detailed guidance and make the process of imposing death rationally reviewable. The aggravating circumstance instruction at issue in Godfrey applied if "[t]he offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim."
The definition used in Libby's case was substantially similar to the definition that the Godfrey court found unconstitutional. In Robins v. State, 106 Nev. 611, 628, 798 P.2d 558, 569 (1990), however, we noted that the Georgia statute at issue in Godfrey was not unconstitutionally vague on its face but that the statute had been applied unconstitutionally. We thus held that if an aggravating circumstance is based upon depravity of mind, it must include torture, mutilation or some other serious and depraved physical abuse beyond the act of killing itself." See also Jiminez v. State, 106 Nev. 769, 774, 801 P.2d 1366, 1369 (1990). In Libby's case, the jury received no such limiting instruction. Therefore, we conclude that the depravity of mind instruction was applied unconstitutionally.
In Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the Supreme Court held that the federal constitution does not prevent a state appellate court from upholding a death sentence which is based in part on an invalid or improperly defined aggravating circumstance. According to Clemons, this court may reweigh the aggravating and mitigating evidence, or we may conclude that there was harmless error. See also Parker v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) (confirming holding in Clemons). In the case at bar, there remains one valid aggravating circumstancethat the murders were committed during the commission of a robbery (NRS 200.033(4)) to be weighed against the one mitigating factor of Libby's family background. NRS 200.035(7).
When faced with one remaining valid aggravating circumstance and one mitigating circumstance, each of which have approximately equal factual support, we may decline to affirm the imposition of the death penalty and resubmit the penalty determination to a new jury. This process is unnecessary in Libby's case, however, because the factual basis supporting the aggravating circumstance far outweighs that supporting the mitigating circumstance. The facts supporting the aggravating circumstance are that these murders were committed in an execution-like manner and were for monetary gain. The jury found that Libby's family background was a mitigating circumstance. This finding could not have been based on a finding that Libby had been neglected or abused as a child, because no such evidence was presented. Rather, this circumstance could only be based on the support family members provided Libby at trial and the obvious concern they showed for him when testifying. The facts supporting the finding of a mitigating circumstance have unequal persuasive impact when compared to those supporting the aggravating circumstance. *1059 We therefore conclude, as required by Stringer v. Black, ___ U.S. ___, ___, 112 S.Ct. 1130, 1136, 117 L.Ed.2d 367 (1992), that the invalid aggravating circumstance was not a significant factor in sentencing Libby to death.

Cumulative Error
Libby argues that cumulative errors denied him a fair trial and mandate reversal of his conviction. This court will reverse a conviction when the cumulative effect of errors results in the denial of a fair trial. E.g., Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986) (cumulative effect of prosecutor's injection of personal beliefs into argument, combined with comments on post-arrest silence, mandated reversal of conviction of first degree murder); Big Pond v. State, 101 Nev. 1, 692 P.2d 1288 (1985) (because the evidence was not overwhelming, cumulative effect of errors which were not egregious standing alone warranted reversal of sexual assault conviction). The considerations relevant to deciding whether error is harmless or prejudicial include whether the issue of innocence or guilt is close, the quantity and character of error, and the gravity of the crime charged. Big Pond, 101 Nev. at 2, 692 P.2d at 1289. We conclude that the evidence of guilt in this case is overwhelming and that in light of the egregiousness of the crimes, none of the errors individually or cumulatively warrants reversal of either the convictions or the sentence.

Proportionality
NRS 177.055(2)(d) mandates a determination of whether the sentence of death is excessive, considering both the crime and the defendant. See Jones v. State, 107 Nev. 632, 817 P.2d 1179 (1991). Considering the heinous nature of the killings, we conclude that the sentence was not excessive or disproportionate to the penalty imposed. See Doleman v. State, 107 Nev. 409, 812 P.2d 1287 (1991) (evidence of defendant's culpability in robbery and murder of cab driver was sufficient to satisfy requirements for imposition of death penalty); Crump v. State, 102 Nev. 158, 160-161, 716 P.2d 1387, 1388-1389 (1986), cert. denied, 479 U.S. 871, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986).

Remaining Allegations of Error
Libby presents the following additional issues on appeal: (1) whether the district court erred in excusing approximately one-third of the one hundred and fifty jurors summoned, without notice or a hearing to determine whether particular jurors should be excused; (2) whether the district court's rulings during voir dire resulted in the denial of Libby's rights to a fair trial by an impartial jury; (3) whether the district court erred by failing to suppress evidence discovered in the search of the Chevrolet Blazer; (4) whether the district court erred by limiting the funds available to the defense to transport witnesses to the trial; (5) whether the district court erred by excluding the testimony of various character witnesses from the defense presentation; (6) whether the district court erred by rejecting the defense instructions proffered at the guilt phase of the trial; (7) whether the prosecutor committed prejudicial misconduct during closing arguments at the guilt phase of the trial; (8) whether venue was proper as to two of the counts of grand larceny; (9) whether the district court denied Libby due process by failing to hold a pretrial hearing to determine the facts and evidence in support of the alleged aggravating factors; (10) whether the district court erred by rejecting the defense instructions proffered at the penalty hearing; (11) whether the prosecutor committed prejudicial misconduct during closing arguments at the penalty phase of the trial; (12) whether there is sufficient evidence of the aggravating factors; and finally, (13) whether the failure of the jury to find additional mitigating factors demonstrates the jury's failure to understand, or misapplication of, its instructions. After review of the record, we conclude that Libby's remaining contentions lack merit.
We further hold that Libby's sentence was not imposed under the influence of passion, prejudice, or any arbitrary factor. In addition, we conclude that Libby's sentence *1060 of death is not excessive considering both the crime and the defendant.
Accordingly, we affirm the conviction and the sentence.[2]
STEFFEN and YOUNG, JJ., concur.
SPRINGER, Justice, concurring in part and dissenting in part:
I concur in the judgment of conviction; however, in light of the fact that "this court, to date, has been unable to provide any clear and consistent guide to judges, juries, prosecutors or defense counsel as to the correct procedure for juries to follow in the death-sentencing process," I cannot join in affirming the judgment of death. Canape v. State, 109 Nev. ___, 859 P.2d 1023 (1993) (Springer, J., dissenting).
NOTES
[1] For Count III, the court sentenced Libby to serve fifteen years on the charge of robbery and to serve fifteen years for the use of a deadly weapon in the commission of a crime pursuant to NRS 193.165. The fifteen years for the use of a weapon in the commission of a robbery is to run consecutively to the fifteen year sentence on the robbery in Count III.

For Counts IV, V, VI, VII, and VIII, the court sentenced Libby to serve ten years on each count charging grand larceny. Each ten year sentence is to run consecutive to one another and consecutive to Count III and the enhancement. The sentences imposed on Counts III through VIII all are to run consecutive to the death sentences imposed on Counts I and II, and Counts I and II are to run consecutive to each other.
[2] The Honorable Miriam Shearing, Justice, did not participate in the decision of this appeal.