MELVIN McCRANEY, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 24131

March 30, 1994                                        871 P.2d 922

*Wright, Judd & Winkler,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Chief Deputy, *Robert L. Langford,* Deputy, Clark County, for Respondent.

---

*Laura Wightman FitzSimmons,* Las Vegas, for Amicus Curiae Nevada Trial Lawyers Association and Nevada Attorneys for Criminal Justice.

## OPINION

*Per Curiam:*

Appellant Melvin McCraney ("McCraney") was convicted of first degree murder with the use of a deadly weapon in the killing of Kinnie Poole ("Kinnie"), but was acquitted of the murder of Kinnie's cousin, Tony Poole ("Tony"). For reasons stated below, we reverse McCraney's conviction and remand for a new trial.

### FACTS

On September 18, 1991, McCraney's brother, Lorne, and his friend, Ronald Williams ("Williams"), went to McCraney's new house on Duchess Street in Las Vegas. Not finding McCraney at home, the two went to the nearby house of a friend who told them McCraney was in the desert riding in a four-wheeler with Derrick Hicks ("Hicks"). Lorne and Williams returned to McCraney's house to retrieve Lorne's car.

As Lorne was backing his car out of McCraney's driveway, another car came down the street and stopped behind him, blocking his way. Tony's brother, Anthony Crockett ("Crockett"), and a friend got out of the car and approached Lorne. Crockett was carrying a gun. After an exchange of words, Crockett and Lorne began struggling for the gun. The gun went off, injuring Lorne's finger. At that point, Lorne jumped into the back seat of his car. He claimed that Crockett then took $300.00 from him and left.

After Crockett's departure, Lorne left his car and went to a nearby friend's house. Lorne then contacted Hicks by phone and told him that "Anthony Poole" (not Anthony Crockett) had shot him.

Meanwhile, Williams, who had fled when Crockett's gun went off, saw McCraney and Hicks driving by. Williams ran to the car and told McCraney that his brother, Lorne, had been shot and might be hurt. Fearing the worst, McCraney, Hicks and Williams immediately raced to McCraney's house.

On the way to his house, McCraney attempted to call 911 on his cellular phone, but was nervous and unable to dial properly. However, unbeknownst to McCraney and the others, the call to 911 had connected and all subsequent events were recorded throughout the first ten minutes following the homicides.

When McCraney arrived at his house, Lorne was not there, but his car was blocking the driveway. Thinking Lorne might be at the hospital, the three decided to move Lorne's car so they could drive McCraney's car to the hospital to look for Lorne. McCraney, Hicks and Williams went into the house to retrieve Hicks' Tech 9mm semi-automatic handgun that Hicks had stored in McCraney's den. The reason for retrieving the gun was apparently to provide protection from Crockett on the way to the hospital. As they were leaving the house, Hicks fired one shot to make sure the gun was loaded. One block away, Lorne heard the shot and headed back to McCraney's house.

Elsewhere at this time, Crockett and a friend joined Tony and Kinnie and decided to "take Crockett's gun home." Tony and Kinnie left in Tony's gray Cadillac; Crockett and his friend left in another car, and the four headed toward Duchess Street. Tony and Kinnie drove east on Duchess toward McCraney's house, while Crockett drove east on Rossmoyne, a street running parallel to Duchess. Crockett heard shots which driving down Rossmoyne, left his car and headed toward Duchess.

Meanwhile, Lorne arrived at McCraney's house as McCraney and Hicks were pushing his car out of the driveway. At that point, Williams, who was waiting in another car, shouted to the others that he could see Tony's Cadillac coming slowly toward them on Duchess. McCraney recognized Tony, and as the car approached, McCraney shouted to Hicks to shoot. Hicks froze, so McCraney grabbed the gun and approached the driver's side of the Cadillac. McCraney and Tony exchanged words. McCraney testified that he saw Tony reach to the floor of the car and come up with a gun. McCraney then rapid-fired Hicks' gun through the driver's side window. McCraney testified that after he fired the shots, Tony said, "Man, I'm going to get you," and took off down the street in the car. During this burst of gunfire, McCraney had shot Tony

in the chest and Kinnie, who was riding in the passenger seat, in the left side.

Tony drove rapidly down Duchess, lost consciousness and crashed into a tree, dying almost immediately from his bullet wounds. At some point, Kinnie had jumped out of the car. As Tony drove off, Kinnie was left standing in the street. McCraney testified that Kinnie ran toward him, whereupon he shot Kinnie. Kinnie fell face down to the street.

McCraney testified that at that moment, Lorne grabbed the gun and shot Kinnie several times in the back as Kinnie lay dying in the street. McCraney did not tell his attorneys this until after Lorne testified at McCraney's trial that McCraney was the sole shooter.

After the shooting, McCraney, Lorne, Williams and Hicks jumped into Williams' car and drove to Williams' house. At this point 911 was still recording the incident. McCraney commented to Lorne that one of the victims was "straight shooting at me." Lorne asked, "Why didn't you shoot Tony?" McCraney responded that he had. McCraney also said he wanted to go to the police since he had acted in self-defense. Shortly thereafter, McCraney dialed his mother's number, thereby disconnecting the 911 call.

Meanwhile, back at the shooting scene, a crowd of more than one hundred had gathered by the time the police arrived, thus making preservation of the evidence difficult at best. Detectives at the scene testified that they found no weapons or identification of any kind on the victims. Crockett had arrived at the scene having heard the gunshots and told the police that the shooting had been done by the man "who owned the Honda" (Lorne). However, Crockett later testified that McCraney had done the shooting, although it was never established that Crockett had actually witnessed the shootings.

A jury acquitted McCraney of the murder of Tony, finding that McCraney had acted in self-defense. However, the jury found him guilty of the first degree murder of Kinnie with the use of a deadly weapon. McCraney was sentenced to life with the possibility of parole. His sentence was enhanced pursuant to NRS 193.165 with a consecutive sentence of life with the possibility of parole for the use of a deadly weapon. McCraney now appeals, making numerous assertions of error including: (1) the district court erred in refusing to give McCraney's proffered jury instruction on accidental homicide; and (2) the State improperly made use of McCraney's post-*Miranda* silence for impeachment purposes.

We now conclude that there are two separate and independent grounds for reversal in this case. We will discuss each in turn.

## DISCUSSION

We first address the issue of the district court's refusal to instruct the jury on accidental homicide. McCraney offered the following instruction:

> All persons are liable to punishment except those persons who committed the act through misfortune or by accident, when it appears that there was no evil design, intention or culpable negligence.

The court refused to give this instruction, holding that the instruction was vague, confusing, and not specifically applicable to the facts of the case and the charges.

McCraney now claims that the shot that killed Kinnie may have been fired when Kinnie was in the car and McCraney was firing at Tony in self-defense, thus making Kinnie's death accidental. The State argues that McCraney was not entitled to an accidental homicide instruction because his theory of defense was self-defense. Further, he presented no evidence of accidental homicide.

However, McCraney correctly points out that there was evidence presented that the shot that might have killed Kinnie was fired while Kinnie was still in the car. Medical Examiner Giles Green testified that a gunshot wound sustained by Kinnie to his left side was fatal since it pierced the heart. He also testified that Kinnie could have gotten out of the car after being hit before losing consciousness. In addition, Medical Examiner Green testified that the gunshot through Kinnie's left side travelled the same path as one which went through Tony's side. Finally, Ted Raymond, identification specialist for the City of North Las Vegas Police Department, testified that there was blood spattering on the passenger door and seatbelt coil, thereby illustrating that Kinnie had been shot while still in the car.

We have held that a defendant has a right to have the jury instructed on his theory of the case as disclosed by the evidence, no matter how weak or incredible that evidence may be. Margetts v. State, 107 Nev. 616, 818 P.2d 392 (1991). Further, NRS 175.161(3) states that either party may present a proposed instruction and request it be given, and if the court thinks the instruction is correct, it must be given. In the instant case, evidence was presented that could have allowed the jury to find that McCraney might have shot and killed Kinnie accidentally.

The State maintains that McCraney did not present evidence himself that Kinnie's death was accidental; therefore, he was not

entitled to the instruction. The State is incorrect. To require a defendant to introduce evidence in order to be entitled to a specific jury instruction on a defense theory would violate the defendant's constitutional right to remain silent by requiring that he forfeit that right in order to obtain instructions.

Failure to instruct the jury on a theory of the case supported by the evidence presented is reversible error. *Margetts,* 107 Nev. at 619, 818 P.2d at 395. We therefore hold that the district court erred in refusing to instruct McCraney's jury on accidental homicide after evidence was presented that could have allowed the jury to reach such a verdict. Accordingly, we reverse McCraney's conviction and remand for a new trial.

We next address additional error in the form of prosecutorial misconduct. Specifically, we address what we hold to be a violation of Doyle v. Ohio, 426 U.S. 610 (1976), and further hold this violation merits reversal and remand for a new trial.

Following his arrest, McCraney was read his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), but chose to remain silent. Prior to Lorne's testimony that McCraney was the sole shooter, McCraney had told no one that Lorne had fired the final shots into Kinnie. McCraney testified at trial that Lorne had taken the gun from him and had fired the final shots into Kinnie as Kinnie lay face down in the street. During cross-examination by the State, the following exchange took place.

Q. You're testifying under oath that your brother Lorne was one of the shooters?
A. Yes.
Q. My question is: Why didn't you say something sooner?
A. I didn't want to snitch on my brother.
. . . .
Q. So you are testifying that despite your knowledge of your brother's involvement, you didn't tell anyone about that?
A. No.
Q. On September 19, 1991, did you tell the police that your brother, Lorne McCraney, was also involved as a shooter of Kinnie Poole?
A. No.
Q. You had an opportunity to do that, didn't you?
A. No.
Q. You could have done it, couldn't you?
A. They didn't ask me no questions.
Q. Then you didn't volunteer any information?
A. Right.

During closing arguments, the State again commented on McCraney's post-*Miranda* silence:

> He's had almost eight months, 240 days, 3,360 hours, or whatever; eight months with the discovery, with the benefit of counsel, with all the witness statements, and for the first time he tells the story claiming self-defense.

McCraney did not object to the State's questions and comments at trial, and thus, the State argues that McCraney failed to preserve this issue for appeal. However, we have held that where prosecutorial misconduct is prejudicial, the court may intervene *sue sponte* to protect the defendant's right to a fair trial. Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 235 (1986); *see also* Emmons v. State, 107 Nev. 53, 61, 807 P.2d 718, 723 (1991) (this court may address plain error or issues of constitutional dimension *sue sponte*).

In *Doyle,* the United States Supreme Court held that the use for impeachment purposes of a defendant's silence at the time of arrest and after receiving *Miranda* warnings violates the Due Process Clause of the Fourteenth Amendment. Recently, the Supreme Court held that an error under *Doyle* fits within the category of constitutional violations characterized as "trial error." Brecht v. Abrahamson, ...... U.S. ......, 113 S.Ct. 1710, 1717 (1993) (citing Arizona v. Fulminante, 499 U.S. 279 (1990)). For this reason, such a violation must be analyzed under the harmless error standard found in Chapman v. California, 386 U.S. 18 (1967). *Brecht,* ...... U.S. ......, 113 S.Ct. at 1717; *see also* Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986).

We have repeatedly condemned such prosecutorial misconduct as occurred in the instant case. *See, e.g.,* Neal v. State, 106 Nev. 23, 787 P.2d 764 (1990); Aesoph v. State, 102 Nev. 316, 721 P.2d 379 (1986); McGee v. State, 102 Nev. 458, 725 P.2d 1215 (1986); Mahar v. State, 102 Nev. 488, 728 P.2d 439 (1986). In *Neal,* a case very similar to the instant case, we held that prosecutorial misconduct of this kind is not harmless beyond a reasonable doubt when the defendant's credibility is crucial to his defense and the prosecutor's comments are deliberate and repetitious as they were here. *Neal,* 106 Nev. at 25-26, 787 P.2d at 765.

In the instant case, McCraney's credibility was essential to his defense of self-defense. Indeed, any time a defendant is testifying in his own defense, his credibility is vital. Here, the prosecutor persisted in questioning McCraney regarding his post-*Miranda* silence as well as mentioning it in closing arguments, all for the purpose of impeaching McCraney's credibility. We cannot conclude beyond a reasonable doubt that the jury would have reached the same verdict absent the prosecutor's improper comments.

Therefore, it is clear that the *Doyle* violation in this case did not constitute harmless error. Accordingly, we hold that the prosecutor infringed upon McCraney's Fourteenth Amendment right to due process by making use of McCraney's post-*Miranda* silence for impeachment purposes in both cross-examination and closing arguments. Such a violation compels us to order a new trial. *See Neal,* 106 Nev. 26, 787 P.2d 765.

## *CONCLUSION*

In conclusion, we hold that the district court erred in refusing to instruct the jury on accidental homicide when evidence was presented that would have allowed the jury to reach such a verdict. We also hold that McCraney's Fourteenth Amendment right to due process was violated by the prosecutor's use of McCraney's post-*Miranda* silence for impeachment purposes in violation of *Doyle.* We have carefully considered McCraney's other assertions of error and find them to be without merit.

Accordingly, we reverse McCraney's conviction and remand for a new trial.